THE STATE, EX REL. NATIONAL BROADCASTING COMPANY, INC. ET AL., *v.*
COURT OF COMMON PLEAS OF LAKE COUNTY ET AL.

[Cite as State, ex rel. Natl. Broadcasting Co., *v.* Lake Cty. Court of Common
Pleas (1990), 52 Ohio St. 3d 104.]

(No. 90-378—Submitted May 29, 1990—Decided June 20, 1990.)

*Squire, Sanders & Dempsey, Terrence J. Clark* and *Richard M. Knoth,* for relators.

*Wiles & Richards* and *Albert L. Purola,* for respondents Judge Martin Parks and the Court of Common Pleas of Lake County.

*John Hawkins,* for respondent Judge Paul Mitrovich.

*Per Curiam.* We issue a writ of prohibition in the following respects:

(1) Except with respect to court personnel, respondents are prohibited

from maintaining the order issued by Judge Parks on January 25, 1990, in *State of Ohio* v. *Ronald Luff, supra,* and from issuing a new order unless a hearing is held and findings are made pursuant to the standards and procedures set forth in *Press-Enterprise Co.* v. *Superior Court* (1986), 478 U.S. 1 (*"Press-Enterprise II"*);

(2) Respondents are prohibited from enforcing Judge Parks' orders, issued on January 25 and February 13, 1990, in *State of Ohio* v. *Ronald Luff, supra,* deeming defendant in that case a witness able to request that he not be photographed, filmed, or videotaped while in the courtroom; provided, however, that the judge shall enforce C.P. Sup. R. 11(C)(2) and Canon 3(A)(7)(c)(iii) of the Code of Judicial Conduct while the defendant is actually testifying should the defendant choose to testify; and

(3) Respondents are prohibited from enforcing Judge Mitrovich's order, issued March 6, 1990, in *State of Ohio* v. *Alice Lundgren, supra,* which forbids the taking or publication of jurors' names or photographs "in or out of the courtroom"; provided, however, that the judge shall enforce Canon 3(A) of the Code of Judicial Conduct in the courtroom; and further provided, that he may reissue the order or a comparable order after holding a hearing and making findings of fact as required by *State, ex rel. Beacon Journal Pub. Co.,* v. *Kainrad* (1976), 46 Ohio St. 2d 349, 75 O.O. 2d 435, 348 N.E. 2d 695, so long as the order does not prevent the publication of information obtained from publicly available court records or in open court.

We deny the writ with respect to:

(1) Judge Parks' order of February 8, 1990, in *State of Ohio* v. *Ronald Luff, supra,* that relators preserve news and commentary tapes concerning the deaths of the Avery family; and

2. Judge Mitrovich's order of March 6, 1990, in *State of Ohio* v. *Alice Lundgren, supra,* that witnesses may not be photographed if they object thereto.

We defer action on Judge Mitrovich's March 6, 1990 order prohibiting television cameras or broadcasting in the trial of Alice Lundgren, if or as amended by his order of May 4, 1990, pending Judge Mitrovich's response to relators' motion for summary judgment or the lapse of time for response.

I

The January 25, 1990 Gag Order

On January 25, 1990, Judge Parks issued the following so-called "gag order":

"This cause came on for consideration of Defendant's Motion For Protective Order.

"Upon consideration whereof, the Court finds said Motion well taken and that said Motion should be granted, and that with the exception of responding to questions from the media concerning court dates and times, all Court personnel, including the Judge, all prosecutor's staff and personnel, including the prosecutor, all defense counsel staff and personnel, including both primary defense counsel, and all law enforcement agencies and personnel, should not make any extra judicial statement by means of public communication other than 'no comment' on the above-captioned case, subject to the contempt powers of this Court."

In his motion to dismiss or for judgment on the pleadings, Judge Parks argues that relators lack standing to challenge an order not directed at them, absent an allegation that the persons subject to the gag order would be willing to discuss the case with rela-

tors were they free to do so. We reject this argument and hold that relators do have standing to challenge the order.

Gag orders are considered a less restrictive alternative to restrictions imposed directly on the media. *Nebraska Press Assn.* v. *Stuart* (1976), 427 U.S. 539, 564. Nevertheless, they do indirectly restrict access to proceedings. The Supreme Court of the United States and this court have addressed the standing of the media in direct access cases and the conditions under which such access may be limited. In *State, ex rel. Dayton Newspapers,* v. *Phillips* (1976), 46 Ohio St. 2d 457, 75 O.O. 2d 511, 351 N.E. 2d 127, we held in paragraph two of the syllabus:

"A newspaper has standing to seek a writ of prohibition to prevent a trial court from enforcing an order improperly excluding the public and reporters for the news media from pretrial hearings on a motion to suppress evidence."

That decision applies with no less force to the criminal case as a whole. Therefore, since we find a gag order, such as that issued by Judge Parks on January 25, 1990, to be a restriction on access, albeit a lesser restriction than an order directed at the media, we apply *Dayton Newspapers* to the present case and hold that relators do have standing to seek a writ of prohibition.

Second, Judge Parks argues that the gag order is authorized by law, citing *Sheppard* v. *Maxwell* (1966), 384 U.S. 333. Relators reply that *Sheppard* is not determinative and that a court issuing a gag order must apply the same standards and follow the same procedures that a court must follow in deciding whether to exclude the public altogether. See *Press-Enterprise II; Press-Enterprise Co.* v. *Superior Court* (1984), 464 U.S. 501 ("*Press-*

*Enterprise I*"); *State, ex rel. The Repository,* v. *Unger* (1986), 28 Ohio St. 3d 418, 28 OBR 472, 504 N.E. 2d 37. In *Press-Enterprise II,* the United States Supreme Court, following a line of cases beginning with *Richmond Newspapers, Inc.* v. *Virginia* (1980), 448 U.S. 555, held that there is a federal constitutional right of access to proceedings in a criminal prosecution which have "historically been open to the press and general public" and in which "public access plays a significant positive role in the functioning of the particular process in question." *Press-Enterprise II, supra,* at 8. "* * * If the particular proceeding in question passes these tests of experience and logic, a qualified First Amendment right of public access attaches. * * *" *Id.* at 9. The proceeding is presumed open to the press and public. "The presumption of openness may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest." *Press-Enterprise I, supra,* at 510. A case-by-case determination of the necessity of. closure is required. *Globe Newspaper Co.* v. *Superior Court* (1982), 457 U.S. 596, 607-608.

In *State, ex rel. The Repository,* v. *Unger, supra,* we recognized that a qualified right of access is also embraced by Section 16, Article I of the Ohio Constitution, the "open courts" provision of our Bill of Rights. Public access to criminal trials is also supported by the constitutional right of the accused to a public trial. "The underlying premise of a public trial is that the public is a party to all criminal proceedings. Criminal cases are prosecuted in the name of the people because crimes are public wrongs affecting all members of society. * * *" *Id.* at 420, 28 OBR at 474, 504 N.E. 2d at 39.

Criminal trials have historically been open to the public, and public access has always been considered essential to the fair and orderly administration of our criminal justice system. See, *e.g.*, *Globe Newspaper Co.*, *supra,* at 605; *Richmond Newspapers, supra,* at 569; *State* v. *Lane* (1979), 60 Ohio St. 2d 112, 119, 14 O.O. 3d 342, 347, 397 N.E. 2d 1338, 1343. Under *Richmond Newspapers, supra,* and *Press-Enterprise II, supra,* such trials are presumptively open. Accordingly, we hold that a gag order cannot issue unless "specific, on the record findings" are made demonstrating that a gag order is " '* * * essential to preserve higher values and is narrowly tailored to serve that interest. * * *' *Press-Enterprise I, supra,* at 510. See also, *Globe Newspaper* 457 U.S., at 606-607." *Press-Enterprise II, supra,* at 13-14. If the interest asserted is the right of the accused to a fair trial, the gag order may issue only if "specific findings are made demonstrating that, first, there is a substantial probability that the defendant's right to a fair trial will be prejudiced by publicity that * * * [the gag order] would prevent and, second, reasonable alternatives * * * cannot adequately protect the defendant's fair trial rights * * *." *Id.* at 14. Moreover, "representatives of the press and general public 'must be given an opportunity to be heard on the question * * *.' " *Globe Newspaper Co., supra,* at 609, fn. 25, quoting *Gannett Co.* v. *DePasquale* (1979), 443 U.S. 368, 401 (Powell, J., concurring).

Since no such specific findings were made in this case, and relators were given no opportunity to be heard on the question, we grant the writ of prohibition and prohibit enforcement of the January 25, 1990 order, except as it affects court personnel, because it does not comply with the standards and procedures set forth in *Press-*

*Enterprise II* and *Globe Newspaper Co.* We decline to require application of such standards and procedures to gag orders restricting "court personnel subject to * * * [the judge's] direction and control." See Canon 3(A)(6) of the Code of Judicial Conduct. In our view, neither the media nor the public generally has an unqualified right to have court personnel discuss pending or impending proceedings so as to require a hearing and application of the *Press-Enterprise II* standards in every case where such an order may be directed to court personnel. However, we do not consider counsel for the parties to be court personnel, even though, as officers of the court, they are in a sense subject to the court's direction and control, nor may such an order to court personnel restrict or be construed to restrict access to public records generally available to the public.

## II

### The Order to Preserve News and Commentary Tapes

On February 8, 1990, Judge Parks ordered certain relators to "preserve all news and commentary tapes, including out-takes, from January 5, 1990, until trial date concerning the deaths of the Dennis Avery family." Relators allege that this order is "in the nature of a injunction," and therefore should not have issued absent reasonable notice to relators and a hearing on the merits, according to Civ. R. 65.

However, this order was issued in a criminal case, and hence Civ. R. 65 does not apply. Moreover, the apparent purpose of the preservation order was to freeze the status quo pending the issuance of a subpoena for the materials covered. Since a subpoena need not be preceded by notice

and a hearing, we fail to see why a preservation order should be.

In *State, ex rel. New Mexico Press Assn.,* v. *Kaufman* (1982), 98 N.M. 261, 648 P. 2d 300, the New Mexico Supreme Court considered a similar order. In *Kaufman,* the trial court ordered that certain media outlets preserve articles, tapes, and transcripts (presumably of news broadcasts) about a highly publicized criminal case until ten days after the verdict. The *Kaufman* court held that "interference in or regulation of the manner in which a publisher conducts his business is not permissible." *Id.* at 268, 648 P. 2d at 307, citing *Miami Herald Pub. Co.* v. *Tornillo* (1974), 418 U.S. 241, and *Columbia Broadcasting System, Inc.* v. *Democratic Natl. Committee* (1973), 412 U.S. 94 ("*CBS*").

We believe the *Kaufman* court misapplied *Tornillo* and *CBS.* Neither case stands for the broad proposition that a publisher or broadcaster may conduct his business any way he sees fit without governmental intrusion. Rather, they stand for the proposition that government cannot dictate the content of what is published or broadcast.

In *CBS,* the court held that there was no First Amendment right to buy television advertising time in order to speak out on issues. To recognize such a right would threaten First Amendment values by empowering the government to decide "whether a particular individual or group has had sufficient opportunity to present its viewpoint and whether a particular viewpoint has been sufficiently aired." *CBS, supra,* at 127. Thus, *CBS* focused specifically on the danger of allowing government to regulate editorial content.

In *Tornillo,* the question was whether a state could compel a newspaper to print an individual's reply to editorial criticism. Answering this question in the negative, the court again emphasized that the government may not control editorial content:

"The choice of material to go into a newspaper, and the decisions made as to limitations on the size and content of the paper, and treatment of public issues and public officials — whether fair or unfair — constitute the exercise of editorial control and judgment. It has yet to be demonstrated how governmental regulation of this crucial process can be exercised consistent with First Amendment guarantees * * *." *Tornillo, supra,* at 258.

An order directing media outlets to preserve news stories on a particular topic does not control editorial content. Accordingly, *CBS* and *Tornillo* do not speak to such an order's validity.

Relators argue that, since the preservation order was issued in anticipation of a subpoena *duces tecum,* it will have a "chilling effect" on their ability to gather news if allowed to stand, and therefore violates the claimed "qualified privilege * * * to *not* disclose unpublished information[.]" Under the qualified privilege, relators argue, a reporter need not disclose unpublished information in response to a subpoena *duces tecum* unless the party seeking the subpoena can prove (1) that the materials sought are relevant to his case, (2) that he needs the material to establish a claim or defense, and (3) that he has no other way to obtain the information.

In *Branzburg* v. *Hayes* (1972), 408 U.S. 665, the Supreme Court held that reporters could be required to disclose confidential information before a grand jury. The court refused "to grant newsmen a testimonial privilege that other citizens do not enjoy." *Id.* at 690.

Among the reasons cited in *Branz-*

*burg* for rejecting a reporter's privilege were:

(1) Testimonial privileges are generally disfavored because they obstruct the search for truth, *id.* at 688-689, fn. 26, and 690, fn. 29;

(2) Although "news gathering is not without its First Amendment protections," *id.* at 707, it is unclear how much news gathering is actually burdened by the prospect of subpoenas being issued to reporters, *id.* at 693-695; and

(3) Creating a reporter's privilege would require courts "to define those categories of newsmen who qualified for the privilege," a process that would subvert the idea that freedom of the press belongs to "the lonely pamphleteer" as well as the news media, *id.* at 704.

Despite *Branzburg,* many cases do hold that there is a First Amendment reporter's privilege, qualified by a three-part test similar to that urged by relators. See, *e.g., United States* v. *Burke* (C.A. 2, 1983), 700 F. 2d 70, 77; *United States* v. *Cuthbertson* (C.A. 3, 1980), 630 F. 2d 139, 146; *LaRouche* v. *Natl. Broadcasting Co.* (C.A. 4, 1986), 780 F. 2d 1134, 1139; *Miller* v. *Transamerican Press, Inc.* (C.A. 5, 1980), 621 F. 2d 721, 726; *Zerilli* v. *Smith* (C.A. D.C. 1981), 656 F. 2d 705, 713-714. Cf. *Silkwood* v. *Kerr-McGee Corp.* (C.A. 10, 1977), 563 F. 2d 433, 438. At least three Ohio courts have taken a similar view. *Fawley* v. *Quirk* (Ohio App. 1985), 11 Med. L. Rptr. 2336, 2337-2338; *In re McAuley* (1979), 63 Ohio App. 2d 5, 22-23, 17 O.O. 3d 222, 232-233, 408 N.E. 2d 697, 709-710; *Slagle* v. *Coca-Cola, Inc.* (C.P. 1986), 30 Ohio Misc. 2d 34, 35-36, 30 OBR 353, 354-355, 507 N.E. 2d 794, 795.

However, these cases seem inconsistent with *Branzburg.* The United States Sixth Circuit Court of Appeals has pointed out that the qualified privilege recognized by the above cases, with its three-part balancing analysis, resembles the privilege advocated in Justice Stewart's *Branzburg* dissent. See *In re Grand Jury Proceedings* (C.A. 6, 1987), 810 F. 2d 580, 584 (Norris, J.). Like the above-cited cases, Stewart's view would require parties seeking information from reporters to show the information's relevance, their compelling need for it, and the lack of any alternative "less destructive of First Amendment rights * * *." *Branzburg, supra,* 408 U.S. at 743. The losing parties in *Branzburg,* we note, urged the adoption of a similar three-part test. *Id.* at 680. The *Branzburg* court, of course, rejected this approach.

*Branzburg* must be read in light of Justice Powell's concurring opinion in that case, since Powell provided the fifth vote for the majority opinion. Courts finding that *Branzburg* supports the existence of a privilege have observed that Powell, like Stewart, "[found] it necessary to balance" the reporter's interests against those of the litigants. *McAuley, supra,* at 18, 17 O.O. 3d at 230, 408 N.E. 2d at 707. But Powell nonetheless joined the majority opinion in *Branzburg.* This suggests that he saw no inconsistency between his views and the majority opinion and further indicates that he saw his approach as being inconsistent with Stewart's. See *Grand Jury Proceedings, supra,* at 585; cf. *Branzburg, supra,* at 710, fn. (Powell, J., concurring).

As the Sixth Circuit Court of Appeals has explained, when Powell wrote of "the striking of a proper balance between freedom of the press and the obligation of all citizens to give relevant testimony with respect to criminal conduct * * *," *Branzburg, supra,* at 710, he was concerned with

the possibility that law enforcement authorities might demand information only remotely related to a particular investigation, solely "in order to disrupt * * * [a reporter's] relationship with confidential news sources * * *." *Grand Jury Proceedings, supra,* at 586. Thus, a court may enforce a subpoena over a reporter's claim of privilege, so long as it is persuaded that the subpoena has been requested or issued for a legitimate purpose, rather than for harassment.

Although the First Amendment will not shield relators from responding to an eventual subpoena, we note that respondents seek to justify the preservation order by arguing that the tapes will eventually be needed so that the trial court can evaluate pretrial publicity in deciding a possible motion for change of venue. As relators point out, outtakes, which by definition have not been broadcast, could not be relevant to such a purpose. However, if an overbroad subpoena is ultimately issued, relators will have an adequate remedy at law, since they can move to quash it. See Crim. R. 17(C).

Relators also cite R.C. 2739.12, the "reporter's shield" statute. But that statute shields the media only from "disclos[ing] the source of any information procured or obtained by * * * [a reporter] in the course of his employment * * * ." Relators make no allegation that any sources will be disclosed if the tapes are ultimately turned over. Moreover, they would still not be entitled to a hearing until the issuance of a subpoena, since the mere preservation of broadcast material threatens no disclosure of sources; the proper remedy, again, would be a motion to quash.

### III
### Judge Mitrovich's Order

By their "supplemental submission" of March 29, relators object to three portions of Judge Mitrovich's order of March 6: first, that "[t]elevision cameras and/or recording or broadcasting the trial proceedings will not be permitted during the trial * * *"; second, that "[n]ames and photographs o[f] jurors, in or out of the courtroom, shall not be taken or printed * * *"; third, that if a witness objects to being photographed, "the taking of photographs of the objecting witness shall be prohibited." As stated above, we defer a decision on the portion of the order prohibiting television cameras and broadcasting pending Judge Mitrovich's response to relators' motion for summary judgment, which presents new facts.

### A
### The Portion of the Order Prohibiting Obtaining or Publishing the Names and Photographs of Jurors

Relators object to paragraph 12 of Judge Mitrovich's March 6 order, which provided that names and photographs of jurors could not be taken or printed in or out of the courtroom. Again, relators complain that Judge Mitrovich held no hearing before entering this order and did not consider "any of the criteria set forth in Superintendence Rule 11 * * *."

C.P. Sup. R. 11(A) requires the trial judge to permit broadcasting "as provided in Canon 3(A)(7) of the Code of Judicial Conduct." Canon 3(A)(7)(c) (iv) specifically forbids "the filming, videotaping, recording, or taking of photographs of jurors * * *." See, also, C.P. Sup. R. 11(C)(2).[1] Thus, to

---

[1] C.P. Sup. R. 11(C)(2) provides: "The judge shall inform victims and witnesses of their right to object to being filmed, videotaped, recorded or photographed."

the extent that Judge Mitrovich's order forbids taking photographs of jurors in the courtroom, it simply enforces the requirements of Canon 3(A)(7).

The rest of paragraph 12 — forbidding the photographing of jurors *outside* the courtroom, as well as the publication of their names and pictures — we find to be beyond the scope of Canon 3(A)(7) and C.P. Sup. R. 11, which do not purport to regulate the activities of broadcasters or photographers outside the courtroom.[2] The relevant question, then, is whether the First Amendment allows Judge Mitrovich to impose, without a hearing, a prior restraint upon the taking of jurors' pictures outside the courtroom and the publication of their names and likenesses.

In *Sheppard* v. *Maxwell, supra* (384 U.S. 333), where a murder conviction was overturned due to excessive publicity, one important factor was that "the jurors were thrust into the role of celebrities by the judge's failure to insulate them from reporters and photographers. * * * The numerous pictures of jurors, with their addresses, which appeared in the newspapers before and during the trial itself exposed them to expressions of opinion from both cranks and friends." *Id.* at 353.

This passage indicates that the trial court should not allow jurors to become "celebrities," and may "insulate them from reporters and photographers" to prevent this. But a prior restraint on publication is "one of the most extraordinary remedies known to our jurisprudence." *Nebraska Press Assn.* v. *Stuart, supra* (427 U.S.), at 562. An appellate court reviewing such a restraint "must examine the evidence before the trial judge" to determine the nature and extent of pretrial publicity, the availability of alternatives, and the effectiveness of the restraining order at issue. *Id.*

In *State, ex rel. Beacon Journal Pub. Co.,* v. *Kainrad, supra* (46 Ohio St. 2d), at 352, 75 O.O. 2d at 436, 348 N.E. 2d at 697, this court held:

"An order not to publish cannot be considered unless the circumstances are imperative, and it appears clearly in the record that a defendant's right to a fair trial will be jeopardized and that there is no other recourse within the power of the court to protect that right or minimize the danger to it.

"Before issuing any such order not to publish, it is obligatory upon the court to hold a hearing and make a finding that all other measures within the power of the court to ensure a fair trial have been found unavailing and deficient."

Although *Kainrad* did not involve

---

[2] Canon 3(A)(7) provides in pertinent part:

"A trial judge or appellate court should permit:

"* * *

"(c) the broadcasting, televising, recording, and taking of photographs *in the courtroom* by news media during sessions of the court, including recesses between sessions, under the following conditions[.]" (Emphasis added.)

Similarly, C.P. Sup. R. 11(A) provides in pertinent part:

"The judge presiding at the trial or hearing shall permit the broadcasting or recording * * * and the taking of photographs *in court proceedings* open to the public as provided in Canon 3(A)(7) of the Code of Judicial Conduct. The judge * * * shall specify the place or places *in the courtroom* where the operators and equipment are to be positioned. Requests for permission for the broadcasting, televising, recording, or taking of photographs *in the courtroom* shall be in writing * * *." (Emphasis added.)

a ban on publishing jurors' names, it has been cited by the Supreme Courts of New Mexico and Iowa in cases that did involve such a ban: *State, ex rel. New Mexico Press Assn.*, v. *Kaufman, supra,* and *Des Moines Register & Tribune Co.* v. *Osmundson* (Iowa 1976), 248 N.W. 2d 493.

In *Kaufman,* the court considered the validity of an order that prohibited publication of the names of "prospective or selected jurors." *Kaufman, supra,* at 266, 648 P. 2d at 305. The court held that "a prior restraint on publication of jurors' names must be based upon imperative circumstances supported by a record that clearly demonstrates that a defendant's right to a fair trial will be jeopardized and that there are no other reasonable alternatives to protect that right." *Id.* at 267, 648 P. 2d at 306, citing *Kainrad, supra.* See, also *Osmundson, supra,* at 501 (citing *Kainrad*).

Under this test, relators' allegations entitle them to relief. Judge Mitrovich does not dispute relators' claim that he held no hearing, considered no alternatives (*e.g.,* sequestration), and made no findings. The portion of his order directed against the publishing of the jurors' names and pictures is therefore unauthorized by law. See *Kainrad, supra.*

Moreover, if the jurors' names are revealed in open court, or if relators get them from publicly available court records, the judge cannot prevent relators from publishing them by an order invoking prior restraint, even if he holds a hearing and makes findings sufficient to satisfy *Kainrad.* It is well-settled, despite implications to the contrary in both *Kainrad* and *Kaufman,* that "[t]hose who see and hear what transpired [in the courtroom] can report it with impunity." *Craig* v. *Harney* (1947), 331 U.S. 367, 374. Nor may the press be prohibited from

"truthfully publishing information released to the public in official court records." *Cox Broadcasting Corp.* v. *Cohn* (1975), 420 U.S. 469, 496. See also, *Oklahoma Pub. Co.* v. *District Court* (1977), 430 U.S. 308; *Nebraska Press Assn., supra,* at 568; *Sheppard* v. *Maxwell, supra,* at 362-363; *Shifflet* v. *Thomson Newspapers, Inc.* (1982), 69 Ohio St. 2d 179, 184, 23 O.O. 3d 205, 208, 431 N.E. 2d 1014, 1018. But, cf., *Smith* v. *Daily Mail Pub. Co.* (1979), 443 U.S. 97, 103, in which the court read its prior cases as "suggest[ing] strongly that if a newspaper lawfully obtains truthful information about a matter of public significance, then state officials may not constitutionally punish publication of the information, *absent a need to further a state interest of the highest order*" (emphasis added), and *Gannett Co.* v. *Delaware* (Del. 1989), 571 A. 2d 735, in which the Supreme Court of Delaware upheld a trial court order that withheld announcement of the jurors' names during the trial proceedings. The Delaware court held that this order (unlike the one before us) did not involve prior restraint, and did not require application of the *Press-Enterprise II* standard and procedure because it found that national historical practice did not require release of jurors' names, but gave trial courts discretion over such matters. *Gannett Co., supra,* at 748.

In the present case, however, Judge Mitrovich's order regarding the taking or publishing of jurors' names is clearly a prior restraint requiring application of *Kainrad.*

### B
### The Portion of the Order Prohibiting Taking Photographs of Witnesses Who Object

Insofar as Judge Mitrovich's order prohibited taking photographs of

witnesses who object, we find the order clearly supported by C.P. Sup. R. 11(C)(2) and *Sheppard* v. *Maxwell, supra.*

## IV
### Judge Parks' Order That the Defendant Luff Not be Photographed

Respondents argue that Count III of the complaint does not state a claim. Count III alleges that Judge Parks ordered that the defendant, Ronald Luff, not be photographed, filmed, or taped while in the courtroom. Respondents justify this order based upon C.P. Sup. R. 11(C)(2) and by the Code of Judicial Conduct.

C.P. Sup. R. 11(C)(2) requires the judge to "inform victims and witnesses of their right to object to being filmed, videotaped, recorded or photographed." Likewise, Canon 3(A)(7)(c)(iii) of the Code of Judicial Conduct provides that "the filming, videotaping, recording, or taking of photographs of victims or witnesses who object thereto shall not be permitted."

The crux of respondents' argument is that a defendant is a "witness" within the meaning of C.P. Sup. R. 11 and Canon 3(A)(7)(c)(iii). It seems clear that a defendant is a "witness" when he is testifying. But Judge Parks ordered the media to keep its cameras off the defendant in the courtroom at all times. Thus, he apparently thought the defendant is a "witness" not only during his testimony, but before and after.

Respondents' broad interpretation of "witness" would give the defendant-witness greater rights than the non-party witness. A non-party witness may not be photographed when he is testifying. However, Canon 3(A)(7)(c)(iii) does not protect him when he is not testifying.

We have held that a testifying defendant is "entitled to the same rights and privileges, and * * * subject to the same cross-examination as any other witness." *Hanoff* v. *State* (1881), 37 Ohio St. 178, 180. Although *Hanoff* dealt with the proper scope of cross-examination of a defendant-witness, the broader principle underlying *Hanoff* is that a defendant-witness should generally be treated the same as a non-party witness (except, of course, where a constitutional provision or rule of court provides otherwise), with both receiving "the same rights and privileges * * * ." Respondents' expansive reading of "witness" is inconsistent with that principle.

Respondents' broad reading of "witness" would treat the defendant-witness and non-party witness the same in that neither may be photographed while in the courtroom. But such a comparison is erroneous. The rule against photographing witnesses who object serves the purpose of avoiding distractions that might interfere with the witness' ability to testify. That purpose would not be served by a ban on photographing the defendant when he is in court, but off the stand.

Accordingly, we do not construe the word "witness" in C.P. Sup. R. 11(C)(2) and Canon 3(A)(7) as including a defendant who intends to testify but is not actually testifying. A defendant's intention to testify is not a sufficient basis for the court to completely forbid relators to take pictures of him in the courtroom.

## V
### Procedural Motions

Relators' motions for expedited scheduling and oral argument, and respondents' motions to dismiss and to strike language from the complaint are overruled. Defendant Luff's motion to intervene is also overruled.

## VI
### Issuance of a Peremptory Writ

Relators' motion for summary judgment is granted in part and overruled in part. Likewise, respondent Judge Mitrovich's motion for summary judgment is granted in part and overruled in part. As stated, we defer action on the motions for summary judgment regarding that portion of Judge Mitrovich's March 6 order prohibiting television cameras and broadcasting, if or as affected by his May 4 order, until after the response to relators' motion, or the lapse of time for response.

We have held in an analogous situation "that a peremptory writ of mandamus should issue in the first instance only when material facts are admitted disclosing that relator is entitled to relief as a matter both of law and fact." *State, ex rel. Temke,* v. *Outcalt* (1977), 49 Ohio St. 2d 189, 191, 3 O.O. 3d 248, 249, 360 N.E. 2d 701, 702.

R.C. 2731.06 provides, in relevant part:

"When the right to require the performance of an act is clear and it is apparent that no valid excuse can be given for not doing it, a court, in the first instance, may allow a peremptory mandamus."

When the material facts are not admitted, an alleged right to performance is "unclear," *id.,* and hence, R.C. 2731.06 does not apply.

Thus, *Temke* forbids a court to grant a writ of mandamus "before an answer admitting or denying the material facts ha[s] been filed." *State, ex rel. Mazzaro,* v. *Ferguson* (1990), 49 Ohio St. 3d 37, 40, 550 N.E. 2d 464, 468. However, relators cite *State, ex rel. Hughes,* v. *Brown* (1972), 31 Ohio St. 2d 41, 60 O.O. 2d 23, 285 N.E. 2d 376. In *Hughes,* we issued an alternative writ of prohibition ordering the Secretary of State to show cause why

he should not be permanently prohibited from dismissing the relators from a county board of elections. This court treated the secretary's submission as a motion to dismiss and concluded that it was not well-taken as a matter of law. Since the secretary did not deny the averments in the complaints, the failure of his legal arguments meant that he had failed to show cause why the writs should not issue.

*Temke* is arguably distinguishable from the instant case, and from *Hughes,* since it does not appear that an alternative writ was issued in *Temke.* But it is still true here, as it was in *Temke,* that "the facts underpinning the claimed right are not admitted * * * ," *id.* at 191, 3 O.O. 3d at 249, 360 N.E. 2d at 702, nor have all the relators' allegations been proven. However, as this court said in *Hughes,* at 43, 6 O.O. 2d at 24, 285 N.E. 2d at 377, one of the purposes of an alternative writ is to shorten a respondent's answer date. Issuance of an alternative writ here underlines that "time is of the essence where news value is concerned." *State, ex rel. Chillicothe Gazette, Inc.,* v. *Court of Common Pleas* (1982), 2 Ohio St. 3d 24, 25, 2 OBR 570, 571, 442 N.E. 2d 747, 748. We therefore accept relators' undenied allegations as true. See, also, *State, ex rel. Beck,* v. *Casey* (1990), 51 Ohio St. 3d 79, 83, 554 N.E. 2d 1284, 1288.

Therefore, since no material facts remain unestablished, we proceed to issue the writ and grant the writ in part, deny it in part, and defer action in part, as previously stated.

*Judgment accordingly.*

MOYER, C.J., SWEENEY, H. BROWN and RESNICK, JJ., concur.

HOLMES, DOUGLAS and WRIGHT, JJ., separately concur.

HOLMES, J., concurring. I am in full agreement with most of the First Amendment legal principles expressed by the majority, but will comment briefly upon one aspect of the trial court's orders, that which prohibits the publishing of the names of the jurors.

It is true that the names and addresses of those persons who are called to be potential jurors in a given case are contained in the jury commissioner's files, and as such are public records. The publishing of such information may not ordinarily be restrained by a trial court. Additionally, jurors' names and addresses revealed in open court may be published with impunity.

However, a trial court may, under proper circumstances, determine not to reveal the names of prospective jurors as they are individually called upon voir dire, and to continue to conceal the names and addresses of those actually selected for the jury. The trial court, in a given highly publicized and highly volatile case, may determine that countervailing considerations may outweigh the press's First Amendment rights. Among those considerations are the accused's Fourteenth Amendment due process right to a fair trial, *Sheppard* v. *Maxwell* (1966), 384 U.S. 333, and the jurors' interest in privacy and protection from danger and harassment, see, *e.g.*, *United States* v. *Gurney* (C.A.5, 1977), 558 F. 2d 1202, certiorari denied *sub nom. Miami Herald Publishing Co.* v. *Krentzman* (1978), 435 U.S. 968.

Where there is great potential of jury harassment or harm, the forces in conflict may be very plain and easily understood by the trial court and it may issue a protective order to protect the integrity and impartiality of the jury in such a high-profile case. No such concerns for the jury were shown in the instant case. Therefore, the order of the trial court regarding nondisclosure of the jurors' names went beyond the necessities of this matter.

DOUGLAS, J., concurring. In general, I concur with the judgment of the majority.

I write separately for the following reasons:

I

I do not agree with the majority's application of *State, ex rel. Temke,* v. *Outcalt* (1977), 49 Ohio St. 2d 189, 3 O.O. 3d 248, 360 N.E. 2d 701. In fact, it appears that the majority itself does not adhere to *Temke* when the majority uses as its authority *State, ex rel. Hughes,* v. *Brown* (1972), 31 Ohio St. 2d 41, 6 O.O. 2d 11, 285 N.E. 2d 335. The citing and discussing of *Hughes* is appropriate.

II

I do not agree with the off-hand statement by the majority that "* * * [a] case-by-case determination of the necessity of closure is required." For that proposition, the majority cites *Globe Newspaper Co.* v. *Superior Court* (1982), 457 U.S. 596, 607-608. Statements like this, out of context, have a habit of creeping into future decisions as statements of authority. The full statement from *Globe* referenced by the majority actually reads "* * * [a] trial court can determine on a case-by-case basis whether closure is necessary *to protect the welfare of a minor victim. * * *"* (Emphasis added.) *Id.* at 608. This is obviously *not* what we have in the case at bar and, in any event, *even* in *Globe,* the court found the closure order to be invalid.

III

I do not agree with the majority's

analysis of the holding of *Miami Herald Pub. Co.* v. *Tornillo* (1974), 418 U.S. 241. The majority says that *Tornillo* stands "for the proposition that government cannot dictate the content of what is published or broadcast." That is not the proposition for which *Tornillo* stands. As indicated by former Chief Justice Burger's unanimous majority opinion and the concurring opinions of Justice Brennan (joined in by then Justice and now Chief Justice Rehnquist) and Justice White, *Tornillo* is a "right of reply" case; it does not involve "content" of a publication.

## IV

Likewise, I do not agree, in connection with the case at bar, with the citing by and discussion of the majority of *Branzburg* v. *Hayes* (1972), 408 U.S. 665. In *Branzburg,* Justice White said "[t]he issue in these cases is whether requiring newsmen to appear and testify before state or federal grand juries abridges the freedom of speech and press guaranteed by the First Amendment." *Id.* at 667.

The case now before us does not involve newspersons appearing before grand juries. It only involves whether a court has the power to order newsgatherers not to dispose of material they have gathered. A different set of rules applies.

## V

Part II of the majority opinion discusses "The Order to Preserve News and Commentary Tapes." Included in this section is a statement that the order in question "* * * was issued in a criminal case, and hence Civ. R. 65 does not apply. * * *" Such a statement ignores Crim. R. 57(B): "If no procedure is specifically prescribed by rule, the court may proceed in any lawful manner not inconsistent with these rules of criminal procedure, and shall look to the rules of civil procedure and to the applicable law if no rule of criminal procedure exists."

Further, the majority equates the order to a subpoena and cites to Crim. R. 17(A). If the order is in the nature of a subpoena, then it is subject to a motion to quash (or a protective order) and a hearing to determine the validity of the motion to quash is then held. No hearing was afforded to relators here.

In addition, of course, is the more serious First Amendment question of the right of newsgatherers to gather the news. Just the existence of the order brings about a chilling effect on what information may be gathered and which persons may be interviewed.

## VI

Finally, in the trial court's March 6, 1990 order, it is provided that any actions of a media representative in violation of any of the orders "* * * shall also *be imputed to the employing publisher* * * * and shall be subject to *contempt.* Failure * * * to abide by these rules * * * shall subject the media representative as well as its *publisher* to * * * a citation for *contempt, punishable by* a fine and/or *imprisonment.* * * *" (Emphasis added.) Imputing criminal liability to a publisher for the actions of a reporter is serious business, indeed!

WRIGHT, J., concurring. I am in agreement with the judgment in this case and the bulk of the commentary. However, I agree with Justice Douglas' observations in Parts I, III, and IV of his concurrence.