DECISION AND JOURNAL ENTRY
{¶ 1} Defendant-Appellant Shawn Cripple has appealed from his convictions in the Akron Municipal Court for reckless operation of a motor vehicle, operating a motor vehicle without reasonable control, failure to observe rules for motorcycles, and failure to display a license plate. This Court affirms.
 I {¶ 2} In May 2002, two employees of the Akron Beacon Journal reporter Andrea Misko and photographer Ken Love — arranged to meet Appellant and several of his companions at a Dairy Queen on Cuyahoga Falls Avenue in Akron, Ohio. After a brief conversation, Appellant drove off on his motorcycle. Ms. Misko and Mr. Love followed in a vehicle driven by one of Appellant's companions, and Mr. Love photographed Appellant engaging in a variety of stunts as the vehicles traveled on Akron highways.
 {¶ 3} On July 14, 2002, the Akron Beacon Journal published an article written by Ms. Misko and Stephanie Warsmith detailing Appellant's motorcycle stunts on Akron streets. The feature included photographs taken by Mr. Love which depicted Appellant standing upright on the seat of a motorcycle, and riding backwards on the motorcycle with his arms and legs outstretched.
 {¶ 4} After an investigation by the Akron police department, Appellant was charged with ten minor misdemeanor traffic violations: three counts of reckless operation, in violation of R.C. 4511.20; three counts of operating a motor vehicle without reasonable control, in violation of R.C. 4511.202; three counts of failing to observe rules for motorcycles, in violation of R.C. 4511.53; and one count of failure to display a license plate, in violation of R.C. 4503.21. Appellant entered a plea of not guilty to the charges, and the case was set for trial.
 {¶ 5} The city served subpoenas on Ms. Misko, Ms. Warsmith, and Mr. Love, ordering each to appear and testify at Appellant's trial. Counsel for the Beacon Journal Publishing Company and the subpoenaed journalists filed a motion for an order quashing the subpoenas "or other wise protecting [the journalists] from a set of overbroad, invasive subpoenas[.]" In a memorandum in support of its motion, the newspaper argued that the work product of its journalists was protected from compelled disclosure by privileges based on the First Amendment to the United States Constitution, the Ohio Constitution, and R.C. 2739.12. The city responded in opposition to the motion, and the trial court scheduled the matter for a hearing.
 {¶ 6} Following the hearing, the court issued a detailed ruling which granted the motion to quash the subpoena served upon Ms. Warsmith on the ground that she did not witness the events captured in the photographs which gave rise to the city's prosecution of Appellant. The court denied the motion to quash the subpoenas issued to Ms. Misko and Mr. Love, however, concluding that their testimony was not protected by any constitutional privilege or by R.C. 2739.12. In addition, the court determined that any interest of the newspaper or its reporters in withholding the testimony sought by the subpoena was outweighed by the information's relevance, the city's inability to obtain it by reasonable alternative means, and the city's compelling interest in obtaining the information, pursuant to the balancing test applied by this Court inFawley v. Quirk (July 17, 1985), 9th Dist. No. 11822.
 {¶ 7} The case then proceeded to trial, at which Mr. Love and Ms. Misko testified that they witnessed the stunts depicted in the newspaper photographs. The journalists also identified Appellant as the individual performing the motorcycle tricks. At the conclusion of the trial, the court found Appellant guilty of all ten charges. The court sentenced Appellant to a fine of $100 for each conviction, and a license suspension of six months for each of the three convictions of reckless operation, to be served consecutively. The court stayed execution of the sentence pending appeal. Appellant has timely appealed, asserting three assignments of error.
 II Assignment of Error Number One {¶ 8} "The trial court erred in denying motions to quash the subpoenas directed to Beacon Journal reporters and objections to their subsequent testimony at trial."
 {¶ 9} In his first assignment of error, Appellant has argued that the trial court erred in denying the motion to quash the subpoenas issued to Mr. Love and Ms. Misko. Appellant has contended that the information sought by the city was protected from compelled disclosure by aFirst Amendment reporter's privilege, qualified by a three-part balancing test.
 {¶ 10} In Branzburg v. Hayes (1972), 408 U.S. 665, 92 S.Ct. 2646,33 L.Ed.2d 626, one of the issues before the court was whether a news reporter could invoke a First Amendment privilege in response to a grand jury subpoena ordering him to identify individuals who appeared in newspaper photographs synthesizing hashish from marijuana. Branzburg,605 U.S. at 667-668. In rejecting the claim of privilege in this context, the opinion of Justice White, writing for a majority of the court, held:
 {¶ 11} "[W]e cannot seriously entertain the notion that theFirst Amendment protects a newsman's agreement to conceal the criminal conduct of his source, or evidence thereof, on the theory that it is better to write about crime than to do something about it. Insofar as any reporter in these cases undertook not to reveal or testify about the crime he witnessed, his claim of privilege under the First Amendment presents no substantial question. The crimes of news sources are no less reprehensible and threatening to the public interest when witnessed by a reporter than when they are not." Id. at 692.
 {¶ 12} Although he joined in Justice White's opinion, Justice Powell filed a separate concurring opinion in which he stated that "[t]he asserted claim to privilege should be judged on its facts by the striking of a proper balance between freedom of the press and the obligation of all citizens to give relevant testimony with respect to criminal conduct." Id. at 710 (Powell, J., concurring.) Justice Stewart authored a dissenting opinion, in which he advocated a qualified privilege subject to a three-part balancing test:
 {¶ 13} "[W]hen a reporter is asked to appear before a grand jury and reveal confidences, I would hold that the government must (1) show that there is probable cause to believe that the newsman has information that is clearly relevant to a specific probable violation of law; (2) demonstrate that the information sought cannot be obtained by alternative means less destructive of First Amendment rights; and (3) demonstrate a compelling and overriding interest in the information." (Footnote omitted.) Id. at 743 (Stewart, J., dissenting.)
 {¶ 14} Several Ohio courts, including this Court, have applied a balancing test similar to that advanced by Justice Stewart in assessing claims of a qualified reporter's privilege. See Fawley, supra at 5-6 (applying balancing test to review of a reporter's contempt citation for refusing to reveal the identity of a non-confidential news source); In reMcAuley (1979), 63 Ohio App.2d 5, 22-23 (applying balancing test to determine whether a reporter may be compelled to reveal confidential information or the identity of a confidential source); Slagle v.Coca-Cola, Inc. (1986), 30 Ohio Misc.2d 34, 35-36 (applying balancing test to determine whether reporters may be compelled to produce unpublished photographs of an accident scene pursuant to a subpoena duces tecum). Appellant has argued that the trial court committed reversible error in the case sub judice by failing to apply this three-part test and concluding 1) that the information sought from the journalists could have been obtained by other means, and 2) that the city failed to demonstrate a compelling need for the information.
 {¶ 15} The Ohio Supreme Court, however, has specifically noted that these three cases which apply Justice Stewart's balancing test "seem inconsistent with Branzburg[,]" and that Branzburg rejected the approach advanced by Justice Stewart in his dissent. State ex rel. Natl.Broadcasting Co. v. Lake Cty. Court of Common Pleas (1990),52 Ohio St.3d 104, 110. The court cited with approval the explanation set forth by the Sixth Circuit Court of Appeals, which emphasized that the "balance" described by Justice Powell in his concurring Branzburg opinion referred to the need to enforce subpoenas served upon journalists for legitimate purposes, but to quash those issued merely for harassment.Natl. Broadcasting, 52 Ohio St.3d at 110-111. The Sixth Circuit explained in detail the operation of the proper balancing test espoused by the majority in Branzburg:
 {¶ 16} "[C]ourts should * * * follow the admonition of the majority in Branzburg to make certain that the proper balance is struck between freedom of the press and the obligation of all citizens to give relevant testimony, by determining whether the reporter is being harassed in order to disrupt his relationship with confidential news sources, whether the grand jury's investigation is being conducted in good faith, whether the information sought bears more than a remote and tenuous relationship to the subject of the investigation, and whether a legitimate law enforcement need will be served by forced disclosure of the confidential source relationship." In re Grand Jury Proceedings
(C.A. 6, 1987), 810 F.2d 580, 586.
 {¶ 17} We need not further define the parameters of the balancing test or "privilege" applicable to information gathered by news reporters, however, because neither the journalists nor the newspaper have appealed the denial of the motion to quash the subpoenas issued to Ms. Misko and Mr. Love. Although judicial interpretations of the scope of the Branzburg decision have not always been consistent, courts have uniformly held that any privilege or protection from compelled disclosure by news reporters belongs to the journalist, and not the informant or news source. See Branzburg, 408 U.S. at 695; McAuley,63 Ohio App.2d at 17; State v. Ventura (1999), 101 Ohio Misc.2d 15, 21. Likewise, a plain reading of the "reporters' shield" statute indicates that the privilege set forth therein is conferred exclusively upon persons "engaged in the work of, or connected with, or employed by any newspaper or any press association for the purpose of gathering, procuring, compiling, editing, disseminating, or publishing news[.]" R.C. 2739.12. Consequently, Appellant does not have standing to assert any protections, constitutional or statutory, that are proprietary to the newspaper or its reporters. Appellant's first assignment of error must fail.
 Assignment of Error Number Two {¶ 18} "The court erred in denying appellant's motion for acquittal for insufficiency of the evidence at the close of testimony."
 {¶ 19} In his second assignment of error, Appellant has argued that the trial court erred by denying his motion for acquittal pursuant to Crim.R. 29. Appellant has contended that the city presented insufficient evidence from which the court could 1) identify the person in the photographs as Appellant, and 2) establish the date on which the incidents captured in the photographs took place.
 {¶ 20} When reviewing the legal sufficiency of the evidence to support a criminal conviction, it is the function of this Court:
 {¶ 21} "[T]o examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." State v. Jenks
(1991), 61 Ohio St.3d 259, paragraph two of the syllabus.
 {¶ 22} "`[S]ufficiency' is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law." (Quotations omitted.) State v. Thompkins
(1997), 78 Ohio St.3d 380, 386. A reversal of a verdict based on the insufficiency of the evidence means that no rational trier of fact could have found the defendant guilty. Id. at 387.
 {¶ 23} Appellant has first argued that the city presented insufficient evidence from which the court could identify Appellant as the person in the photographs. Appellant has maintained that the photographs admitted into evidence to establish the traffic violations depict only a helmeted rider engaged in various motorcycle stunts, and do not show the rider's face or other features that would allow identification of the rider as Appellant. Mr. Love and Ms. Misko, however, both testified that they met Appellant at a Dairy Queen before Appellant performed the stunts shown in the photographs. Mr. Love testified that he was within two feet of Appellant on the Dairy Queen premises, during which time Appellant was not wearing his helmet. Ms. Misko also testified that she spoke with Appellant at the Dairy Queen while Appellant was not wearing his helmet. Both journalists identified the rider in each photograph as Appellant, and identified Appellant in the courtroom as the rider they met and photographed.[1] In addition, both Ms. Misko and Mr. Love described the manner in which Appellant was riding the motorcycle at the time the photographs were taken.
 {¶ 24} Appellant has also contended that the city failed to adduce sufficient evidence from which the court could establish the date on which the alleged offenses took place. In support of his argument, Appellant has cited testimony by Mr. Love that the photographs were taken "[p]robably less than 8" weeks before the article was published on July 14, 2002, and "within a 2-month window" of the date of publication. However, Ms. Misko testified that she and Mr. Love met Appellant at the Dairy Queen and followed Appellant while he did the stunts depicted in the photographs on May 22, 2002.
 {¶ 25} Construing the evidence most strongly in favor of the city, we must conclude that sufficient evidence was adduced at trial from which the court could have 1) identified Appellant as the rider depicted in the photographs, and 2) established the date on which the motorcycle stunts described by the journalists and depicted in the photographs were performed as May 22, 2002. Appellant's second assignment of error is without merit.
 Assignment of Error Number Three {¶ 26} "The court abused its discretion in suspending [appellant's] drivers license because under all of the circumstances, appellant caused no harm and, in fact, the testimony indicated that he took affirmative measures to prevent risk of harm to other persons."
 {¶ 27} In his third assignment of error, Appellant has argued that the trial court erred in sentencing him to consecutive license suspensions. According to Appellant, the evidence demonstrates that he took precautions to ensure that he was not a hazard to surrounding traffic, and there was no testimony that he caused any harm or risk of harm that would have supported the suspension of his license. Appellant has further contended that the city presented no evidence that he exceeded the speed limit, changed lanes, caused an accident, or caused any other person to have an accident or commit any traffic violations while performing the photographed stunts.
 {¶ 28} R.C. 4507.34 provides, in relevant part:
 {¶ 29} "Whenever a person is found guilty under the laws of this state * * * of operating a motor vehicle in violation of such laws * * * relating to reckless operation, the trial court of any court of record may, in addition to or independent of all other penalties provided by law, suspend for any period of time or revoke the driver's license * * * of any person so convicted or pleading guilty to such offenses for any period that it determines, not to exceed one year."
 {¶ 30} This Court reviews a trial court's decision to suspend a defendant's driving privileges pursuant to R.C. 4507.34 for an abuse of discretion. State v. Tamburin (2001), 145 Ohio App.3d 774, 780, appeal not allowed (2002), 94 Ohio St.3d 1430. "`[A]buse of discretion' connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." State v. Lowe
(1994), 69 Ohio St.3d 527, 532, quoting State v. Adams (1980),62 Ohio St.2d 151, 157.
 {¶ 31} "[A] court of record, in deciding whether to suspend a driver's license pursuant to R.C. 4507.34, is entitled to consider all the evidence the record reveals which is probative of whether a defendant's operation of a motor vehicle was reckless[.]" State v.Hartman (1987), 41 Ohio App.3d 142, 144, fn. 3. "That a driver's operation of a motor vehicle was reckless is a conclusion reached by examining both the driving in issue and all the circumstances under which it took place. Foremost among these circumstances is the threat this manner of operation poses to others." (Emphasis sic.) Id.
 {¶ 32} The record in the case sub judice is replete with evidence that the manner in which Appellant operated his motorcycle threatened the safety of other drivers. The testimony of Mr. Love and Ms. Misko, as well as Akron Police Lieutenant Richard Decatur, established that Appellant performed the stunts on public highways in Akron. In the photographs depicting Appellant's stunts, Appellant can be seen standing on the seat of the motorcycle and laying backwards on the seat with his arms and legs outstretched, facing away from his direction of travel. While Appellant was performing these stunts, his hands were not in close proximity to the handlebars and his feet were nowhere near the foot brake. Mr. Love testified that Appellant performed the stunts while traveling at approximately forty miles per hour, and that Appellant was "up and down within 2 or 3 seconds." Lieutenant Decatur testified that a vehicle traveling at 40 miles per hour would travel one hundred twenty-eight feet in two seconds. As the trial court noted, "[Appellant] would be unable to see, much less gain control of his motorcycle, if a problem as potentially minor as a pothole arose, or a problem as potentially dangerous as a sudden stop by the vehicle in front of him occurred." According to Ms. Misko, Appellant would have been performing the stunts between approximately 5:00 and 5:30 p.m., during rush hour traffic. The trial court characterized the traffic shown in two of the photographs as "heavy," and stated that one of the photographs "clearly shows traffic `backed up' behind [Appellant]." Finally, the court observed that one of the photographs "shows [Appellant] dangerously close to the center line and oncoming traffic."
 {¶ 33} After reviewing all the evidence in the record, we cannot conclude that the trial court acted arbitrarily, unreasonably, or unconscionably in sentencing Appellant to consecutive six-month license suspensions for his three convictions of reckless operation. Appellant's third assignment of error is not well taken.
 III {¶ 34} Appellant's assignments of error are overruled. The judgment of the trial court is affirmed.
Judgment affirmed.
BATCHELDER, J. concurs.
BAIRD, P.J. concurs in judgment only.
[1] During the trial, the court allowed Appellant to sit with four other males in the first row of the gallery rather than at the defense table. However, the court denied Appellant's motion to allow him and his companions to wear their motorcycle helmets while the journalists testified for purposes of in-court identification.