JUSTICE NELSON
dissents as follows:
I agree that the District Court’s August 16,1996 Restrictive Order should be reversed. I concur in our discussion and analysis as to the appropriateness of supervisory control and as to Issue 1.1 respectfully dissent from our decision that the trial participant or indirect gag order imposed by the court in this case is not a prior restraint on the media’s right to gather news and to publish and, derivatively, on the public’s right to know and receive information. To the contrary, I conclude that such a gag order is a de facto prior restraint that presents the same evil of “censorship at the source” which we heretofore condemned in Great Falls Tribune v. District Court (1980), 186 Mont. 433, 438, 608 P.2d 116, 119, and that traditional prior restraint analysis is, therefore, required.
Before setting out the legal analysis of my disagreement with our decision on Issue 2, I will make one general observation. The trial participant gag order issued by the District Court in this case is, as far as I can tell, unprecedented in Montana. If this case involved something akin to the trial of O.J. Simpson, Rodney King, Timothy *308 McVeigh, Theodore Kaczynski or the Menendez brothers, I might understand (though not necessarily agree with) the trial court’s concern that what is now commonly referred to as the “media circus” of cameras, equipment, satellite dishes, reporters and commentators, all in search of ratings and a story to sell, might prejudice the accused’s right to a fair trial. The fact is, however, O.J. Simpson, Kippy Joe Hill is not!
There is absolutely no evidence in the meager record of this case to date that would support a conclusion that Kippy Joe Hill’s right to a fair trial was threatened either at the time the indirect gag orders were issued by the Justice and District Courts or that his rights are presently in jeopardy. The charges against Mr. Hill are, in fact, no more “high profile” or of greater public interest than a multitude of other homicide cases that have been tried over the decades or that are presently pending in Montana’s courts. Quite to the contrary, there have been numerous homicide cases in Montana that have garnered infinitely more interest and ink than this case. See, for example, Duncan McKenzie, “The Mountain Men,” Larry Moore, Ronald Smith, Becky Richards, Dewey Coleman, Bernard Fitzpatrick, Gene Austad, the Kills on Top brothers, Terry Langford, Brett Byers, James Egelhoff, Fred Van Dyken, Douglas Turner, William Gollehon — the list could go on and on. Yet, each of those cases was prosecuted and defended without resort to the sort of preemptive strike against freedom of speech, freedom of the press and the public’s right to know and to receive information that the trial participant gag order imposed in this case clearly presents. Indeed, at oral argument, Mr. Hill’s defense counsel readily conceded that there was nothing unique about this homicide case.
Now, unfortunately, there is. For the first time we approve the use of trial participant gag orders by courts in criminal proceedings. While, I am not usually impressed by “slippery slope” arguments, I do have that concern here. Gag orders are simply too easy to impose. The one issued here by the Justice Court was imposed ex parte; the second one was imposed by the District Court and affected probably more than twenty people, including lawyers, witnesses, law enforcement and clerks, without so much as an evidentiary hearing or any input from the media, apparently simply because the defense counsel and the prosecutor agreed that these trial participants should be gagged.
Like the majority, I am not necessarily critical of the District Judge’s handling of this matter in view of counsels’ agreement and *309 our lack of precedent, but the fact remains, this case ably demonstrates how it is all too easy to violate fundamental rights of free speech, free press and the public’s right to know and to receive information with a well-meaning stroke of a pen.
Furthermore, even under the four-part approach which we have adopted, a court anxious to maintain the appearance of tight control over the case and counsel, fearful that its rulings may be publicly criticized, concerned over the threat of adverse pretrial publicity, determined to preemptively head off change of venue problems and the possibility of having to sequester the jury with the attendant impact on the local treasury, and set on making sure that the case is tried locally, will find little difficulty in gagging at least some of the trial participants. I greatly fear that although we have not allowed the “primrose path that leads to destruction of those societal values that open, public trials promote” to advance into the courtroom, Great Falls Tribune, 608 P.2d at 121, we have now effectively paved precisely such a route from the courthouse door to the reporter’s desk.
Having made that general observation, I must next admit to being mystified with our reasoning and discussion of Issue 2 and with our holding that trial participant gag orders, including the one at bar, do not constitute prior restraints on publication, and, therefore, are not subject to traditional prior restraint analysis. We first acknowledge the vaunted position of the public’s and media’s right to receive information about the entire criminal law process under Montana’s Constitution — rights which are even more extensive and jealously guarded than such rights under the federal constitution. With that, I heartily agree. We then, however, conclude that trial participant gag orders are not prior restraints because they do not infringe upon the media’s “right to edit or publish that which it knows.” How this latter conclusion follows from the first is not clear. In fact, in my view, it does not track at all.
Admittedly, I have no background whatsoever in journalism. Notwithstanding, I have always understood that “news” is “gathered.” That is, the information which the media reports concerning a person or event must be first obtained by the reporter from someone, from some document or thing, or from some personal observation. News information that appears in the print and broadcast media does not, in “Big Bang” fashion, spring spontaneously into existence from the void, bringing with its creation the time, places, people and events reported. There must be a source; and the quantity and quality of the news (ineffective or biased reporting aside) is completely dependent *310 upon the quantity and quality of the sources of information available. No source; no news.
Again, without trying to be overly simplistic, it seems to me that if we tell the press “you can edit and publish what you know” and then, in the next breath, allow those sources of information from which the media traditionally gathers its information to be silenced on any but the most serious and compelling grounds which clearly prejudice the defendant’s fair trial right, we have effectively precluded the press from “knowing,” and, therefore, being able to “edit” or “publish” much of anything. We have handed a thirsty man an empty cup with the admonition “drink all you want; but the well is off limits.” In short, as we have discussed the terms at issue here, the distinction between a direct prior restraint (where the media is gagged) and an indirect prior restraint (where the media’s sources are gagged) is one without a substantive difference. An indirect prior restraint is, de facto, a prior restraint, nonetheless.
Furthermore, making prior restraint analysis dependent upon the status of the party bringing the challenge is simply smoke and mirrors. It is purely a legal fiction with no foothold in reality. If the court imposes a gag order on trial participants — no matter what the level of scrutiny or what sort of test it uses — the end result is precisely the same and is equally intrusive and offensive: the media is prohibited from gathering and publishing the news and the public is prohibited from receiving it. The fundamental rights of both are denied. It is for precisely this reason that I would require the highest level of scrutiny and the imposition of the clear and present danger standard — traditional prior restraint analysis — before I would allow a trial participant gag order to be imposed.
As the majority intimates, it appears clear, from a historical perspective, that the rise of the use of gag orders on trial participants followed in response to the U.S. Supreme Court’s decision in Nebraska Press Ass’n v. Stuart (1976), 427 U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d 683. That case held that a gag order imposed on the media directly and which prohibited publication — in that case of the defendant’s confession — constituted an unconstitutional prior restraint on free speech. It was in that case that the three-part test was articulated that eventually became the basis for the procedure set out in our opinion in State ex rel. Smith v. District Court (1982), 201 Mont. 376, 654 P.2d 982, and in § 46-11-701, MCA. Unfortunately, relying on dictum in Nebraska Press Ass’n that in some circumstances limits maybe imposed on what the contending lawyers, police and witnesses *311 may say to anyone, courts seeking to quash perceived prejudicial pretrial publicity have sought to do indirectly what they were prohibited from doing directly.
That dictum found its genesis in a pre-Nebraska Press Ass’n case, Sheppard v. Maxwell (1966), 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600. Like the “media circus” cases referred to earlier (and unlike the instant case), the homicide trial in Sheppard was characterized as having taken place in the “atmosphere of a ‘Roman holiday for the news media . ...” Sheppard, 384 U.S. at 356, 86 S.Ct. at 1518. The U.S. Supreme Court, critical of the state trial judge’s handling of the publicity, again in dictum, suggested that the judge “might well have proscribed extrajudicial statements by any lawyer, party, witness, or court official which divulged prejudicial matters. ...” Sheppard, 384 U.S. at 361, 86 S.Ct. at 1521.
Importantly, the suggestion in Sheppard and in Nebraska Press Ass’n that indirect gag orders might in some cases be permissible was never anything more than dicta and in each case was simply thrown into the discussion of preferred less restrictive alternatives that might have been available to the trial court under the specific facts of the cases at issue. This is evident from the Supreme Court’s comment in Nebraska Press Ass’n which cited to Sheppard:
At oral argument petitioners’ counsel asserted that judicially imposed restraints on lawyers and others would be subject to challenge as interfering with press rights to news sources. [Citations omitted.] We are not now confronted with such issues. [Emphasis added.]
Nebraska Press Ass’n, 427 U.S. at 564 n.8, 96 S.Ct. at 2805 n.8. Neither case is proper authority for indirect gag orders, and I strongly disagree with our citation to Nebraska Pres Ass’n for that proposition.
Unfortunately, this dicta has taken on a life of its own and has been interpreted as being directive by those courts seeking an easy way to avoid the rule against direct gag orders. The result has been that in the decades since there has been a proliferation of orders restraining trial participants as a means of indirectly restraining the press, notwithstanding the availability of other options suggested by both Sheppard and Nebraska Press Ass’n. See Sheryl A. Bjork, Indirect Gag Orders and the Doctrine of Prior Restraint, 44 U. Miami L. Rev. 165, 176 (1989). Indeed, this trend has accelerated because of highly publicized cases. In response to the “media circus” cases mentioned earlier, at least one commentator has gone so far as to recommend the very sort of preemptive strike approach that the Justice and *312 District Courts utilized in the instant case-i.e. the trial court should impose a gag order on trial participants immediately after the commencement of proceedings and then rely on voir dire to insure that jurors can render an impartial verdict despite outside influences. This commentator maintains that traditional protections such as juror sequestration and change of venue are either violative of jurors’ rights or just plain worthless given the immediate, wide-spread coverage of news events. See Charles H. Whitebread & Darrell W. Contreras, Free Press v. Fair Trial: Protecting the Criminal Defendant’s Rights in a Highly Publicized Trial by Applying the Sheppard-Mu’Min Remedy, 69 S. Cal. L. Rev. 1587, 1620 (1996).
Again, it deserves repeating that the instant case never was and is not now the sort of “high profile,” “media circus” case that has typified the use of and has fueled the continuing debate over the imposition of trial participant gag orders. That fact makes it even more unfortunate that we have chosen the instant low-profile case as the vehicle for approving a practice that is fundamentally based upon highly questionable legal authority.
Moreover, as the majority acknowledges, there is a conflict in the courts and in the circuits as to the appropriate standard under which indirect gag orders are issued. The courts which have upheld the issuance of gag orders on trial participants[1] basically have employed a “reasonable likelihood” standard of review which only requires that the court evaluate whether it is reasonably likely that the pretrial publicity will jeopardize the accused’s right to a fair trial. On the other hand, the courts which have struck down trial-participant gag orders[2] have done so on the basis of the “clear and present danger” or “serious and imminent threat” test, which requires that the court reach an inescapable conclusion that speech will be prejudicial and that the threat of prejudice must be “present or imminent.” This has *313 also been characterized as the “high threshold test.” See 69 S. Cal. L. Rev. at 1609 n.141.
Dissatisfied with either approach, we have now adopted from National Broadcasting Company, Inc. v. Court of Common Pleas (Ohio 1990), 556 N.E.2d 1120, what in theory, at least, is supposed to be a middle tier test with a level of scrutiny — “substantial probability” — that is higher than “reasonable likelihood” but lower than “clear and present danger.”
At the outset, I note that the Ohio Supreme Court’s decision was based primarily upon the U.S. Supreme Court’s decisions in Richmond Newspapers, Inc. v. Virginia (1980), 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973; Globe Newspaper Co. v. Superior Court of Norfolk (1982), 457 U.S. 596, 102 S.Ct. 2613, 73 L.Ed.2d 248; Press-Enterprise Co. v. Superior Court (1984), 464 U.S. 501, 104 S.Ct. 819, 78 L.Ed.2d 629; and Press-Enterprise Co. v. Superior Court (1986), 478 U.S. 1, 106 S.Ct. 2735, 92 L.Ed.2d 1. Those cases did not involve trial participant gag orders, but, rather, dealt with media access to court proceedings or records of one sort or another — matters, which I presume from our analysis under Issue 1, would, in Montana, be covered by the “clear and present danger” test. Accordingly, for whatever reason the Ohio Court adopted the substantial probability test to resolve the indirect gag order question at issue there (and its rationale is more conclusory than explanatory), I fail to see how the authority underpinning the Ohio Court’s decision would, likewise, support our adoption of this approach in Montana. If we relied on the same authority as did the Ohio Supreme Court, we would have to conclude that, in Montana, the higher “clear and present danger” test would govern since Montana protects the right of access to information by the public and the media even more jealously than does the federal government.
Moreover, having extensively discussed the evils of prior restraint and the importance of freedom of speech, freedom of the press and the public’s right to know and to receive information which are specially protected under Montana’s Constitution and our prior case law, and, having concluded that the “First Amendment protects not just speech itself but the entire process of communication, including the exchange of ideas and information between speaker and listener,” I cannot understand how this new test — which makes it easier for a judge to gag the sources of information traditionally relied upon by the media — serves to protect, much less advance, any of those afore *314 mentioned fundamental constitutional rights or the communication process or the exchange of ideas to which we refer.
Finally, and most importantly, the guts of this new test requires a showing — presumably by the person seeking the gag order — that “there is a substantial probability that the defendant’s right to a fair trial will be prejudiced by publicity that the gag order would otherwise prevent.” How exactly the “substantial probability” standard which we embrace differs from the “reasonable likelihood” standard which we reject is not clear, although, in conclusory fashion, the Ohio case and the federal cases which use it assume that there is a difference. Arguendo, if there is a distinction, it is a fine one, indeed.
More to the point, I suggest that simply using this different terminology will not necessarily assist the trial court in making its highly subjective judgment nor will it guarantee the heightened scrutiny which the majority agrees should be brought to bear in the court’s decision-making process. Under the best of circumstances, the court’s assessment of the impact of pretrial publicity at the time when indirect gag orders will most likely issue — very early in the case — can amount to little more than a clairvoyant inquiry into how media coverage might adversely affect a defendant’s right to a fair trial at a stage when it is impossible to actually know. The Court must make a conclusion that is “of necessity speculative, dealing ... with factors unknown and unknowable.” Nebraska Press Ass’n, 427 U.S. at 563, 96 S.Ct. at 2804. Whether the test is “substantial probability” or “reasonable likelihood” makes little practical difference given the paucity of information that will most likely be available at the early stage of the proceedings at which the court will be required to make its decision.
Furthermore, given the fundamental importance of the free speech, free press and freedom of information rights that definitely will be lost by the imposition of an indirect gag order versus the speculative nature of the defendant’s fair trial rights that might be lost if the order is not imposed, I would opt not to cloud what has been historically a bright-line two-tiered approach with an indistinct middle-tier analysis of questionable lineage and doubtful efficacy. In my view, we should adhere to the “clear and present danger” standard for the imposition of trial participant gag orders. I believe this to be the better approach for the following reasons.
First, as I have stated above, I conclude that indirect gag orders are de facto prior restraints and that traditional prior restraint analysis is, therefore, required. While it is argued that trial partici *315 pant gag orders only vicariously affect the press, the whole reason why trial courts issue such orders is to prevent the public dissemination of information. Accordingly, the intended and the real casualties of an indirect gag order are the media’s access to information and the public’s right to receive it.
In this regard, the whole focus of trial participant gag order cases is placed improperly on who is restrained, rather than on what is restrained. An indirect gag order effectively restrains expression in general — precisely the evil that the seminal case on prior restraint, Near v. Minnesota ex rel. Olson (1931), 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357, and later Nebraska Press Ass’n, sought to prohibit. The result is the loss of public debate that New York Times Co. v. Sullivan (1964), 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686, indicated was the primary concern of the First Amendment. To say that the press is free to publish information “it knows” but that the judiciary can dry up the sources of that information sanctions not only a preemptive strike on First Amendment, Article II, Section 7 and Article II, Section 9 rights, but disingenuously exalts form over substance.
Second, as pointed out in our discussion of Issue 1, this Court and the Montana Legislature have already specifically adopted the “clear and present danger” test with regard to pretrial court proceedings and records. Smith, 654 P.2d at 987-88; § 46-ll-701(3)(a) and (6). While neither Smith nor the statute specifically deal with the issue of trial participant gag orders, based upon Article II, Section 9 of the Montana Constitution, this Court and the Legislature have already established that any restraint on the right of access of the public and press to pretrial criminal proceedings must be reviewed under this highest level of scrutiny.
As indirect gag orders are de facto prior restraints on the First Amendment and Article II, Section 9 rights of the press and public, it is wholly inconsistent with existing Montana case and statutory law to adopt some sort of lesser standard of review with respect to the imposition of such orders simply because they impact what is said or disseminated outside the courtroom.
Moreover, the fact that Montana has already adopted this test in relation to closing pretrial proceedings and sealing court records and the fact that we have re-affirmed the use of this test in those circumstances (see our discussion under Issue 1) belies the majority’s expression of concern that application of the clear and present danger standard to judge requests for indirect gag orders would treat First Amendment rights as paramount. If use of this test does not render *316 the rights to free speech, press and to know and receive information paramount in the former setting, there is no rational basis for concluding that using it in the latter context will either. The rights of the press, public and the defendant can be “balanced,” if that is required, in either event.
Third, there are deleterious effects and serious consequences attendant to silencing trial participants that strongly militate against the imposition of indirect gag orders in all but the most clear cut and threatening of circumstances. All citizens, including criminal defendants, have a fundamental constitutional right of free speech under the federal and Montana constitutions. That right is obviously abridged by an indirect gag order. A defendant or his attorney may wish to go to the media with a perceived misuse of the judicial process or abuse by the prosecution; defendants who are public officials may wish to exonerate or explain themselves to their constituents; the defendant may wish to try to salvage his reputation and rebut the charges at a time when public and media attention are most focused upon him — waiting to be acquitted may not serve that same purpose. Since either side may call any witness who has any knowledge of the case, a gag order involving witnesses may have the potential of stifling a wide range of people and commentary — again, likely 20 or more people, from private citizens to public officials, were gagged in the instant case. Witnesses and defendants hailed into court against their wills do not voluntarily waive their First Amendment rights; most never even have an opportunity to protest before the gag order is issued; many — as here — likely do not even know that they are gagged. And, certainly, who among these will invest the time, trouble and expense of going to court to challenge the gag order.
Moreover, simply because one becomes an attorney, he or she does not forfeit First Amendment rights. An attorney may wish to speak out on a case in order to demonstrate the need for legal reform illustrated by his client’s circumstances or to address perceived injustices in the case. Prosecutors and law enforcement may wish to address the public so witnesses and others with knowledge of the crime or the defendant may come forward or to quell public concern. In civil litigation, attorneys may wish to inform the public, for example, of dangerous or defective products or some particular abusive or wrongful practice by an industry or governmental agency.
There exist adequate and effective ways of disciplining attorneys who actually violate the cannons of ethics or rules of professional conduct, short of prior restraint. If violations are subsequently pun *317 ished, then the harm caused, if any, is actually known and the court does not have to rely on speculation as to what “might occur if....”
Furthermore, judges should not be allowed to easily issue indirect gag orders. Issuing such a gag order is easy to do and difficult to undo, as those gagged must appear before the same judge that issued the order to contest it. Attorneys and parties may be reluctant to do that and thus potentially incur the wrath of the issuing judge. Simply ignoring the order will likely bring a contempt citation — again, as in this case — and contesting such a citation is not effective because of the collateral bar rule. All of this has the effect of chilling speech.
Indirect gag orders, because they can be so easily issued, are particularly subject to overuse and over inclusiveness — again, witness the present orders. When judges become censors, there are few, if any, checks and balances (absent, possibly appellate review); the potential for arbitrariness is great; and there is little timely or effective way of combating such abuse. Worse, as mentioned above, indirect gag orders are typically issued early in the case when there is insufficient information on which to actually gauge the impact of publicity or even the need for some sort of protective order. Thus, to a great extent, the issuing judge is operating in a vacuum in imposing the order. While indirect gag orders may be issued out of the legitimate desire to insure the defendant receives a fair trial, they may also be issued out of a desire by the judge to avoid criticism of his or her style, case management or rulings.
Atrial participant gag order will, in all probability, effectively delay public speech to a time when the public has lost interest in the subj ect. Hence, the effectiveness of public comment and debate is lost. Absent public dissemination of information about a case, the public will have little ability to judge the effectiveness, efficiency and fairness of its various legal institutions, organizations and public officers — courts, public offices, law enforcement, even the bar itself — or the competence of public officials involved. The public loses the very source of information it needs to observe and to check the functioning of its government, institutions and public officials.
Fourth, even without focusing on the media’s (or on the gagged participants’) rights and the abridgment of those rights by de facto prior restraint, the public has a concomitant First Amendment right (and a similar right under Article II, Sections 7 and 9 in Montana) to receive information. It has long been a tenant of federal constitutional law that the constitution protects the individual’s right to receive information and ideas. Stanley v. Georgia (1969), 394 U.S. 557, 89 *318 S.Ct. 1243, 22 L.Ed.2d 542; Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc. (1976), 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346.
Although the majority seems to acknowledge this legal principle, it begs the question of how the public is to exercise this constitutional right if the main purveyor of information and ideas — the media — is effectively prohibited from gathering news in order to disseminate it.
Fifth, while the public and press still have access to pretrial and trial proceedings themselves, few people have the time or inclination to actually attend such proceedings. Moreover, those proceedings, even when reported, are highly sanitized via the formalities of courtroom procedure, the rules of evidence and courtroom decorum. Indirect gag orders inhibit or prohibit the press from discovering information that may contradict the courtroom version or provide an independent view of the proceedings at issue as well as the persons and the institutions involved.
In conclusion, it is for all of the above-mentioned reasons that I would hold that trial participant or indirect gag orders are de facto prior restraints upon the media’s rights of free speech and press and upon the media’s and the public’s right to receive information and right to know. As a de facto prior restraint, I would require that the trial judge subject any request for an indirect gag order to the “clear and present danger” test — i.e. the court must be convinced that there is a clear and present danger that the defendant’s right to a fair trial will be prejudiced. And, because, an indirect gag order is a de facto prior restraint, the presumption should be against issuance.
Moreover, before an indirect gag order is issued, the court should be required to give public notice and to hold a hearing on an expedited basis which hearing would include, at a minimum, the defendant, the government and any media organizations that wish to intervene. The court should be required to consider the nature and extent of pretrial publicity; whether an indirect gag order would be effective; and whether other measures would likely mitigate the effects of trial participants not having unrestrained access to the media. Finally, if such an order is imposed, then it should be narrowly drawn as to whom and as to what speech is covered.
Except to the extent that we have adopted some of these procedural safeguards, I cannot agree that our new middle-tier approach and substantial probability standard for the issuance of trial participant gag orders serves to protect, much less advance, the important fundamental rights of freedom of the press, freedom of speech, and *319 the media’s and the public’s right to know and receive information which are extensively protected by Montana’s Constitution and which this Court has, heretofore, jealously guarded. While it may be necessary in rare circumstances to balance the defendant’s fundamental right to a fair trial against these other fundamental rights by the issuance of an indirect gag order, we have in my estimation, improperly adopted a standard which will tip the scale decidedly in the defendant’s favor in routine cases such as the one at bar. In allowing trial participants to be gagged in the absence of evidence of a most clear, present and imminent threat to the defendant’s fair trial rights, we have truly sanctioned “censorship at the source.”
If the “[c]losure of judicial proceedings breeds suspicion and mistrust in the minds of the public and representatives of the media,” Great Falls Tribune, 608 P.2d at 119, will ordering trial participants not to talk to the media produce any different result? I think not.
I respectfully dissent from our decision on Issue 2.
JUSTICE HUNT and DISTRICT COURT JUDGE THOMAS MCK3TTRICK, sitting for former JUSTICE ERDMANN, concur in the foregoing special concurrence and dissent.

. For example: Application of Dow Jones & Co. (2nd Cir. 1988), 842 F.2d 603, cert. denied, 488 U.S. 946, 109 S.Ct. 377, 102 L.Ed.2d 365; Levine v. U.S.Dist. Ct. (9th Cir. 1985), 764 F.2d 590, cert. denied, 476 U.S. 1158, 106 S.Ct. 2276, 90 L.Ed.2d 719; In re Russell (4th Cir. 1984), 726 F.2d 1007, cert. denied sub nom. Russell v. Flannery, 469 U.S. 837, 105 S.Ct. 134, 83 L.Ed.2d 74; United States v. Tijerina (10th Cir.1969), 412 F.2d 661, cert. denied sub nom. Tijerina v. United States, 396 U.S. 990, 90 S.Ct. 478, 24 L.Ed.2d 452.

. For example: United States v. Ford (6th Cir.1987), 830 F.2d 596; Rodgers v. United States Steel Corp. (3rd Cir.1976), 536 F.2d 1001; CBS Inc. v. Young (6th Cir.1975), 522 F.2d 234; Chase v. Robson (7th Cir.1970), 435 F.2d 1059; Connecticut Magazine v. Moraghan (D.Conn.1987), 676 F.Supp. 38.