No. 96-509

IN THE SUPREME COURT OF THE STATE OF MONTANA

1997

STATE OF MONTANA, EX REL.,
THE MISSOULIAN,

Relators,

v.

MONTANA TWENTY-FIRST JUDICIAL DISTRICT
COURT RAVALLI COUNTY, and THE HONORABLE
JEFFREY H. LANGTON, Presiding District Judge,

Respondents.

ORIGINAL PROCEEDING: Supervisory Control

COUNSEL OF RECORD:

For Relator:

Steven S. Carey; Carey, Meismer & McKeon,
Missoula, Montana (argued)

For Respondents:

David E. Stenerson (argued), Kirk Krutilla,
Attorneys at Law, Hamilton, Montana

Hon. Joe Mazurek, Attorney General, Elizabeth
L. Griffing, Ass't Attorney General, Helena,
Montana

Submitted: December 5, 1996

Decided: March 6, 1997
Filed:

_____
Clerk

Justice W. William Leaphart delivered the Opinion of the Court.

Kippy Joe Hill was charged with deliberate homicide for the death of Laurel Elaine Camper which occurred on June 29, 1996. In Justice Court, Hill filed a motion for an order prohibiting dissemination of evidentiary material to the news media. On the same day that the motion was filed, the Justice Court entered an order barring the Ravalli County Sheriff's office, the Ravalli County Attorney's office and anyone else involved in the investigation, prosecution or defense of the matter, from providing any factual or evidentiary information concerning the case to the public or the press.

After entry of the above order by the Justice Court, the State filed an Information against Hill in the Twenty-First Judicial District Court. Hill then requested that the District Court adopt the Justice Court order prohibiting dissemination of any evidentiary information to the press or public. The State opposed the motion and moved to quash the Justice Court order. A brief hearing was conducted on August 14, 1996, wherein the court proposed issuing a restrictive order tailored more narrowly than the Justice Court order. The State agreed with the court's proposal. The District Court then entered an order requiring that certain restrictions on pretrial and trial publicity be followed in conformity with Rule 3.6 of the Rules of Professional Conduct. The court's order (hereinafter referred to as "participant gag order") applied the Rule, not just to attorneys, but to the defendant, defense witnesses, prosecution witnesses, court staff and all law enforcement officers. Three days later, the District Court followed up its order with a Memorandum reiterating its restrictions and also directing that no evidentiary material was to be filed with the court unless it were under seal.

The Missoulian, a local newspaper, filed an Application for Writ of Supervisory Control asking this Court to assume original jurisdiction of this matter to correct the District Court's mistakes of law in issuing the restrictive order and in requiring that any filings referencing evidence in the case be submitted under seal. In an order dated October 17, 1996, we ordered

briefing in the matter and on November 21, 1996 entertained oral argument.  We reverse the restrictive order and remand for further proceedings.

Factual Background

Neither the Justice Court nor the District Court took any evidence or made any factual findings with regard to their respective restrictive orders.  Thus, the record before this Court consists solely of the pleadings and the District Court's "Restrictive Order" of August 16, 1996 and subsequent "Memorandum and Order" dated August 19, 1996.

Appropriateness of Writ of Supervisory Control

Article VII, Section 2 of the Montana Constitution gives this Court "original jurisdiction, to issue, hear, and determine writs . . . ."  Supervisory control is appropriate where the district court is proceeding under a mistake of law, and in so doing is causing a gross injustice.  State ex rel. Forsyth v. District Court (1985), 216 Mont. 480, 484, 701 P.2d 1346, 1348 (overruled on other grounds); State ex rel. Fitzgerald v. District Court (1985), 217 Mont. 106, 114, 703 P.2d 148, 153-54.

Recently, in State ex rel. Mazurek v. District Court (Mont. 1996), 922 P.2d 474, 476-77, 53 St.Rep. 678, 679, we stated:

"Supervisory control is an extraordinary remedy, to be exercised only in extraordinary circumstances.  We have said . . . that to justify such a writ an exigency or emergency must be shown to exist, or that a gross injustice would result from a denial of the writ, and the absence of other adequate relief. . . .  [Supervisory control] has its own appropriate functions, and, without undertaking to define particularly what these functions are, we think one of them is to enable this court to control the course of litigation in the [district] courts where those courts are proceeding within their jurisdiction, but by mistake of law, or willful disregard of it, are doing a gross injustice, and there is no appeal or the remedy by appeal is inadequate. . . ."

State ex rel. Forsyth v. District Court (1985), 216 Mont. 480, 484, 701 P.2d 1346, 1348 (quoting State ex rel. O'Sullivan v. District Court (1946), 119 Mont. 429, 431-32, 175 P.2d 763, 764); accord State ex rel. Mapes v. District Court (1991), 250 Mont. 524, 528-29, 822 P.2d 91, 94.

It is significant to note that we have issued writs of supervisory control in other cases involving media challenges to court-imposed restrictions on access to information about the criminal trial process.  Great Falls Tribune v. District Court (1980), 186 Mont. 433, 608 P.2d 116 and State ex rel. Smith v. District Court (1982), 201 Mont. 376, 654 P.2d 982.  We determine

that the Missoulian's petition presents legal issues which are appropriate for us to resolve through a writ of supervisory control.

Questions Presented

Although the Missoulian submits the same arguments for the reversal of the court's participant gag order and of the court's sealing of evidentiary documents, the requirement that filings be under seal presents an issue separate and distinct from the issue presented by the participant gag order. We determine that the District Court order presents the following two distinct questions for our consideration:

I     Did the court's order violate Article II, Section 9 of the Montana Constitution and  46-11-701, MCA, when it directed that no evidentiary material could be filed with the court unless it were under seal?

II     Did the court's order violate the First Amendment to the United States Constitution, Article II, Section 9 of the Montana Constitution and  46-11-701, MCA, when it directed that the defense counsel and staff, defendant, county attorney and staff, court staff, and all law enforcement officers be bound by the Rules of Professional Responsibility regarding restrictions on pretrial publicity and trial publicity?

Discussion

I     Did the court's order violate Article II, Section 9 of the Montana Constitution and  46-11-701, MCA, when it directed that no evidentiary material could be filed with the court unless it were under seal?

In its Memorandum and Order of August 19, 1996, the District Court ordered that:
no further evidentiary material be filed with the Court unless it is under seal. Motions or briefs shall not refer to evidentiary matters not already of public record as of this date in the Court file except in general terms.

The Missoulian alleges that the District Court erred in not complying with the requirements of  46-11-701(3), MCA, before ordering that all future documents referring to evidentiary matters be filed under seal. Section 46-11-701(3), MCA, provides:
The judge may close a preliminary hearing, bail hearing, or any other pretrial proceeding, including a

hearing on a motion to suppress, and may seal the record
only if:
(a) the dissemination of information from the
pretrial proceeding and its record would create a clear
and present danger to the fairness of the trial; and
(b) the prejudicial effect of the information on
trial fairness cannot be avoided by any reasonable
alternative means.

Although not articulated in its brief, the Missoulian presumes
that the "any other pretrial proceeding" language in subsection (3)
includes the filing of court documents.  Although "any other
pretrial proceeding" could be construed as limited to proceedings
in court it could also be construed to include filings of documents
pertinent to the pretrial process as a whole.  We hold that
"pretrial proceeding" as used throughout  46-11-701, MCA, is
ambiguous, and we must therefore look beyond the plain words of the
statute to determine its meaning.  When legislative intent cannot
be determined from the plain words of a statute the court must
examine the legislative history of the statute.  Christenot v.
State, Dept. Of Commerce (1995), 272 Mont. 396, 401, 901 P.2d 545,
548 (citing Lewis & Clark County v. State, Dept. Of Commerce
(1986), 224 Mont. 223, 226, 728 P.2d 1348, 1350).

Section 46-11-701, MCA, was enacted in 1991 in response to our
decision in State ex rel. Smith v. District Court (1982), 201 Mont.
376, 654 P.2d 982, in which we addressed a request to exclude the
press from a pretrial suppression hearing.  Defendant Smith asked
this Court to close the evidentiary hearing to the public and the
press on the grounds that his fair trial rights would be
substantially affected by dissemination of evidence that might be
suppressed.  Smith, 654 P.2d at 984.  We held that, under the Right
to Know provision of Article II, Section 9 of the Montana
Constitution and the right of access recognized under the First and
Fourteenth Amendments to the United States Constitution, the public
and press can be excluded from a pretrial suppression hearing "only
if dissemination of information acquired at the hearing would
create a clear and present danger to the fairness of defendant's
trial and no reasonable alternative means can be utilized to avoid
the prejudicial effect of such information."  Smith, 654 P.2d at
987.  In arriving at that conclusion, we adopted, in toto, Standard
8-3.2 of the American Bar Association Standards for Criminal
Justice (2nd ed. 1978) as the appropriate test to reconcile the
competing interests of public access and trial fairness.  That
Standard was later codified as  46-11-701, MCA.

The text containing the history of ABA Standard 8-3.2 states
explicitly that "the standard governs both the closing of pretrial
proceedings and the sealing of court records."  (Emphasis added.)
Given that the legislature adopted the standard in toto it follows

that the legislature intended 46-11-701, MCA, to comport with the directives of the Standard. Furthermore, the policy reason behind closing the pretrial suppression hearing in Smith, that of preventing possibly inadmissable evidence from prejudicing potential jurors, is equally applicable to the sealing of evidentiary materials submitted in various court documents normally accessible to the public. We hold, therefore, that "pretrial proceedings," as used in 46-11-701, MCA, includes all documents filed in conjunction with the pretrial process, regardless of whether they constitute "records" of a specific court hearing. In the present case, the record, although sparse, makes it abundantly evident that the District Court did not comply with the explicit requirements of 46-11-701(3), MCA. That is, the court did not conduct an evidentiary hearing and determine that dissemination of information contained in court filings would present a clear and present danger to trial fairness. Neither did the court consider reasonable alternatives to imposing a blanket order sealing all documents containing reference to evidentiary matters.

In fairness to the trial court, it should be noted that the order was entered with the consent of counsel for the State and for the defendant. Thus, given the consent of the parties, there would appear to be no basis for faulting the court for failure to hold an evidentiary hearing and make appropriate findings. However, consent of the parties cannot serve to override the clear intent of 46-11-701, MCA, to balance the public's right to know with the defendant's right to a fair trial. This balancing can only be accomplished by including the media in the process even though the media is not a "party" to the proceeding in the usual sense of that term. Section 46-11-701(1), MCA, specifically requires that the trial judge "shall seek the voluntary cooperation of the news media in delaying dissemination of potentially prejudicial information until the impaneling of the jury or until an earlier time consistent with the administration of justice." In the context of a decision to seal court records, that means that the judge must allow the media to be heard as to whether there are any "reasonable alternative means" available to sealing the records. Section 46-11-701(3)(b), MCA. The parties cannot, by agreement, obviate this requirement. Given that the District Court did not have the benefit of any precedent from this Court interpreting 46-11-701, MCA, we understand why the court proceeded to act on the basis of consent of the parties. We determine, however, that such a procedure fails to comply with the requirements of 46-11-701, MCA, which not only requires specific findings by the court but also requires that the media be allowed to participate in the decision making process.

Additionally, the Montana Constitution provides the public, including the media, with a "right to know" under Article II, Section 9 of the Montana Constitution. Smith, 654 P.2d at 985;

Great Falls Tribune, 608 P.2d at 119. The Right to Know provision provides:

No person shall be deprived of the right to examine documents or to observe the deliberations of all public bodies or agencies of state government and its subdivisions, except in cases in which the demand of individual privacy clearly exceeds the merits of public disclosure.

The court order in question requires that no evidentiary materials can be "filed with the court" except under seal. When a paper is "filed with the court," it is filed with the clerk of court. The clerk of court is a "public body" of the county, which, in turn, is a subdivision of state government. As such, filings with the clerk of court fall within the Right to Know provision of Article II, Section 9 of the Montana Constitution. Associated Press v. State of Montana (1991), 250 Mont. 299, 820 P.2d 421 (overruled in part on other grounds). In Associated Press we held that a statutory requirement that all affidavits filed in support of a motion for leave to file a criminal charge or warrant be filed under seal was an unconstitutional infringement of the publicþs right to know under Article II, Section 9 of the Montana Constitution. Associated Press, 820 P.2d at 423. Evidentiary materials "filed with the court" likewise fall within the Right to Know provision. Because the public has a constitutionally protected right to examine public documents, and a defendant has a constitutionally protected right to a fair trial under Article II, Section 24 of the Montana Constitution, a district court's decision to seal court records must satisfy the standard set out in  46-11-701(3), MCA, which balances these competing interests. Accordingly, we reverse the court's order requiring the filing of documents under seal and remand for further proceedings consistent with our holding above.

II   Did the court's order violate the First Amendment to the United States Constitution, Article II, Section 9 of the Montana Constitution and  46-11-701, MCA, when it directed that the defense counsel and staff, defendant, county attorney and staff, court staff, and all law enforcement officers be bound by the Rules of Professional Responsibility regarding restrictions on pretrial publicity and trial publicity?

For purposes of this discussion, we refer to the media's "right to know" but we note that this right is derivative from, and no greater than, the public's right to know under Article II, Section 9 of the Montana Constitution.
We begin our analysis of this issue by examining our two prior decisions in which we addressed the interplay between the

defendant's right to a fair trial and the public's right to know guaranteed by Article II, Section 9 of the Montana Constitution.

In 1980 we decided Great Falls Tribune v. District Court (1980), 186 Mont. 433, 608 P.2d 116, in which a district court ordered that individual voir dire examination of prospective jurors in a criminal case be closed to the press and the public. The Tribune sought a writ of supervisory control directing the court to allow the newspaper reporter to attend and observe or to hold a hearing and issue findings of fact and conclusions of law showing that the defendant's right to a fair trial would be jeopardized by allowing the media access. We issued an order directing the district court to hold a hearing and submit findings and conclusions to this Court concerning its reasons for closing the voir dire exam. Great Falls Tribune, 608 P.2d at 118. The district court conducted a hearing and, in its findings and conclusions, rejected various alternatives (sequestration of prospective jurors, change of venue and continuance of trial date) to closure of voir dire. The court based the closure on its finding of substantial prejudicial pretrial publicity, misstatements of fact, disclosure of defendant's prior criminal record and disclosure of evidence not generally known to the public. Great Falls Tribune, 608 P.2d at 118.

In rejecting the district court's rationale for closure, we noted that, although the United States Supreme Court had held that the press has no federal constitutional right to access to a suppression hearing, Gannett Co., Inc. v. DePasqualle (1979), 443 U.S. 368, 99 S.Ct. 2898, 61 L.Ed.2d 608, the analysis is considerably different under the Right to Know provision of Article II, Section 9 of the Montana Constitution, which guarantees that any person has the constitutional right to observe court proceedings unless the demands of individual privacy clearly exceed the merits of public disclosure. We held that:

Closure of judicial proceedings breeds suspicion and mistrust in the minds of the public and representatives of the media. Such closure is simply censorship at the source -- a denial of the right to know.

Great Falls Tribune, 608 P.2d at 119. We also held that the public's right to know under Article II, Section 9 of the Montana Constitution had to be balanced against the defendant's right to a speedy trial by an impartial jury under Article II, Section 24 of the Montana Constitution. Great Falls Tribune, 608 P.2d at 119. In applying that balancing test to the case under consideration, we were unable to see how closing the voir dire examination to the public was necessary to guarantee the right to a fair trial. In reaching that conclusion, we noted a further distinction between the case presented and the Gannett case. In contrast to Gannett, which involved a pretrial suppression hearing, the Great Falls Tribune case involved closure of voir dire which is an integral

part of the trial itself.

Closing any part of the trial is simply the first step down that primrose path that leads to destruction of those societal values that open, public trials promote. Nothing short of strict and irreparable necessity to ensure defendant's right to a fair trial should suffice.

Great Falls Tribune, 608 P.2d at 121 (emphasis added). We vacated the order and ordered that the public and the press be allowed to attend the voir dire examination.

Two years later in Smith, we adopted Standard 8-3.2 of the ABA, governing closure of trial proceedings. Smith, 654 P.2d at 987. In Smith, the defendant in a criminal prosecution applied for a writ of supervisory control seeking to exclude the public and media from a pretrial suppression hearing. We first analyzed the effect of United States Supreme Court decisions, rendered since our previous decision in Great Falls Tribune, regarding the interface between a defendant's constitutional right to a fair trial and the right of the public and press to observe criminal proceedings. Smith, 654 P.2d at 985. In Richmond Newspapers, Inc. v. Virginia (1980), 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973, the United States Supreme Court recognized the public and press' right of access to criminal trials under the First Amendment and applied to the states through the Fourteenth Amendment. We noted that, although the Court had construed the First and Fourteenth Amendments as providing a right of access to criminal trials, a right of access to pretrial criminal proceedings had not been recognized in the federal courts.

In contrast, the broad language contained in the Great Falls Tribune case, "that any person has the constitutional right to observe court proceedings," [citation omitted] most certainly encompasses pretrial proceedings as well as the actual trial.

Smith, 654 P.2d at 986.

We jettisoned the "strict and irreparable necessity" standard from Great Falls Tribune and adopted the ABA Standard as the appropriate test to reconcile the competing interests of public access and trial fairness. Thus, based upon the Right to Know provision of Article II, Section 9 of the Montana Constitution and the right of access recognized under the First and Fourteenth Amendments to the United States Constitution, we held that the public and press may be excluded from a pretrial suppression hearing only if dissemination of information acquired at the hearing would create a clear and present danger to the fairness of defendant's trial and no reasonable alternative means can be utilized to avoid the

prejudicial effect of such information.
Smith, 654 P.2d at 987.

We also specifically encouraged trial judges to seek the voluntary cooperation of the news media before invoking closure. Finally, in the context of Smith's motion to suppress evidence due to an allegedly illegal search, we required the district court and the parties to consider the efficacy of entering a prehearing protective order forbidding mention during the hearing of specific items of evidence sought to be suppressed. In remanding for a hearing under the standard set forth, we concluded: "Only if the trial court finds that there is a 'clear and present danger' and that less restrictive alternatives, including a protective order, cannot protect defendant's right to a fair trial, should closure be ordered." Smith, 654 P.2d at 988.

Having summarized our two decisions involving fair trial and public access, it is important to point out that the case sub judice is distinguishable from both Smith and Great Falls Tribune in that it does not involve a trial court order closing a pretrial or trial "proceeding." Rather, the present case involves an order prohibiting the parties, their attorneys, court staff, and members of law enforcement from disseminating information about the case, other than as permitted under Rule 3.6 of the Montana Rules of Professional Conduct. Such trial participant gag orders are distinguishable from closure of court proceedings. In Section I of this Opinion we held that "pretrial proceedings" as used in 46-11-701, MCA, encompasses the filing of all documents with the court. The gag order, on the other hand, restricts participants from discussing the case outside of the courtroom. This restriction cannot be said to constitute part of the pretrial proceedings in that the restriction does not pertain to any official documents or statements that constitute part of the court record in the case. Since a participant gag order does not implicate "pretrial proceedings" it is not subject to the scrutiny of 46-11-701, MCA. Therefore, the District Court did not err by issuing a participant gag order without satisfying the requirements of 46-11-701, MCA. Nevertheless, we must still address the question of whether the participant gag order violates the media's First Amendment rights or its right to know under Article II, Section 9 of the Montana Constitution.

The Doctrine of Prior Restraint

The first question we address is whether the court's order, which indirectly restrains the media's access to certain sources of information regarding the trial proceedings, constitutes a prior restraint, thereby violating the media's First Amendment rights. The doctrine of prior restraint on publication finds its roots in the United States Supreme Court decision in Near v. Minnesota ex rel. Olson (1931), 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357, in which the Court struck down a statute which allowed Minnesota to

enjoin publication of malicious, scandalous and defamatory newspapers. The Court stated: "it has been generally, if not universally, considered that it is the chief purpose of the [freedom of press] guaranty to prevent previous restraints upon publication." Near, 283 U.S. at 713. The Court held that the order entered pursuant to the Minnesota statute was an unconstitutional prior restraint of the press.

A court may impose a prior restraint on the media for the purpose of protecting the integrity of criminal proceedings only if "the gravity of the 'evil,' discounted by its improbability, justifies such invasion of free speech as is necessary to avoid the danger." Nebraska Press Ass'n v. Stuart (1976), 427 U.S. 539, 562, 96 S.Ct. 2791, 2804, 49 L.Ed.2d 683, 699. The Court in Nebraska Press Ass'n held that a court order prohibiting publication of a criminal defendant's confession constituted an unconstitutional prior restraint on publication. In expressing its concerns about prior restraints, the Court stated, "[i]f it can be said that threat of criminal or civil sanctions after publication 'chills' speech, prior restraint 'freezes' it at least for the time." Nebraska Press Ass'n, 427 U.S. at 559. The Court in Nebraska Press Ass'n relied on "[p]rofessional studies . . . recommending that trial courts in appropriate cases limit what the contending lawyers, the police, and witnesses may say to anyone[,]" Nebraska Press Ass'n, 427 U.S. at 564, thereby intimating that, in lieu of prior restraints on the media, restraints on trial participants may be an appropriate means for minimizing prejudicial communications concerning trial proceedings.

In the wake of Nebraska Press Ass'n, there has been considerable disagreement as to whether participant gag orders are prior restraints on the media. Those cases holding that such orders are prior restraints on the media are typified by the Tenth Circuit decision in Journal Publishing Co. v. Mechem (10th Cir. 1986), 801 F.2d 1233. The Tenth Circuit, in response to a publisher's challenge, held that a court order which prohibited jurors from post-trial interviews with the media was an unconstitutional restraint upon the publisher's First Amendment right to gather news. See also CBS, Inc. v. Young (6th Cir. 1975), 522 F.2d 234 (holding that a participant gag order was a prior restraint on CBS' right to gather news); Connecticut Magazine v. Moraghan (D.Conn. 1987), 676 F.Supp. 38 (holding that a gag order directed at the trial attorneys constituted a prior restraint on the right to gather news and derivatively on publication and was therefore unconstitutional).

Other courts take the view that an order which is not directed at the media does not constitute a prior restraint on publication. The Second Circuit employed this rationale in Dow Jones & Co. v. Simon (2nd Cir. 1988), 842 F.2d 603, cert. denied, 488 U.S. 946. In Dow Jones, the trial court had prohibited parties and attorneys

from making extrajudicial statements to the media. Media organizations challenged the order as being a prior restraint of their right to gather news. Dow Jones, 842 F.2d at 608. The Circuit Court held that the determination of whether a gag order constitutes a prior restraint depends upon the status of the challenging party. A gag order constitutes a prior restraint when challenged by the "individual gagged," but not when challenged by a "third party." Dow Jones, 842 F.2d at 609. The court acknowledged that the order in question limited the "flow of information readily available to the news agencies. . . ." Dow Jones, 842 F.2d at 608. Nonetheless, it held that the order was less intrusive upon the media than an order which directly threatened to sanction the media. While an order directed at the media would be examined under the prior restraint standard, an indirect restraint would be permitted upon a showing of "a 'reasonable likelihood' that pretrial publicity [would] prejudice a fair trial." Dow Jones, 842 F.2d at 610. In Dow Jones, the order in question was buttressed by evidence of a threat to the administration of justice and evidence that the lower court had considered less restrictive alternatives such as change of venue, postponement of trial, extensive voir dire and jury sequestration. Dow Jones, 842 F.2d at 611.

The Second Circuit distinguished prior restraints from participant gag orders by pointing out that participant gag orders lack the "most offensive aspect of a prior restraint [which] is the censorship involved by forbidding the dissemination of information already known to the press and therefore public." Dow Jones, 842 F.2d at 608. It is this right to engage in the editorial process free from government intervention which is the core of the constitutional guarantee of a free press. Although participant gag orders impede the flow of communication, they do not intrude upon the prerogative of the media to publish that which it knows. Thus, the Second Circuit held that participant gag orders are not subject to the same level of scrutiny as direct restraints against the press and will be upheld if "reasonable." Dow Jones, 842 F.2d at 609-610.

We agree with the Second Circuit that prior restraint analysis is dependent upon the status of the party bringing the challenge. Additionally, prior restraint analysis is dependent on whether the restraint impacts the media's prerogative to publish that which it knows as opposed to its ability to acquire new information.

While an order restraining the trial participants from communicating with the press may be a prior restraint upon the participants as communicators, it is not a prior restraint upon the press. Since a gag order imposed on trial participants does not "prohibit the publication or broadcast of particular information or commentary," it does not constitute a "previous" or "prior" restraint upon publication of speech. Nebraska Press Ass'n, 427

U.S. at 556. The distinction between restraining orders directed at trial participants challenged by the press and those challenged by the trial participants themselves is illustrated by two decisions from the Ninth Circuit Court of Appeals involving the same restraining order. Compare Radio and Television News Ass'n v. United States District Court (9th Cir. 1986), 781 F.2d 1443 (holding that a restraining order not directed at the press does not restrain the press' First Amendment rights) with Levine v. United States District Court (9th Cir. 1985), 764 F.2d 590, 595 (holding that "the district court's order is properly characterized as a prior restraint" on counsel's First Amendment right to free speech).

As one commentator has observed, the Radio and Television decision illustrates that the prior restraint doctrine does not accommodate receiverþs rights and is "insensitive to restriction of the communication process as a whole." Note, A Prior Restraint by Any Other Name: The Judicial Response to Media Challenges of Gag Orders Directed at Trial Participants, 88 Mich. L. Rev. 1171, 1181 (1990). The same commentator correctly notes that the prior restraint doctrine, in that it focuses solely on the communicator rather than the receiver of the communication, does not extend any protection to the communication process as a whole.

Given that the prior restraint doctrine protects only the rights of the communicator, another means of protecting the communication process as a whole, and the rights of receivers of information in particular, must be employed to safeguard the entire bundle of rights guaranteed by the First Amendment to the United States Constitution and Article II, Section 7 of the Montana Constitution.

The primary purpose of the First Amendment to the United States Constitution is to encourage and protect an "unfettered interchange of ideas for the bringing about of political and social changes. . . ." New York Times Company v. Sullivan (1964), 376 U.S. 254, 269, 84 S.Ct. 710, 720, 11 L.Ed.2d 686, 700. In other words, the First Amendment protects not just speech itself but the entire process of communication, including the exchange of ideas and information between speaker and listener.

Although the United States Constitution, unlike the Montana Constitution, does not specifically guarantee a "right to know," a right to receive information has been recognized under First Amendment principles. See Virginia State Board of Pharmacy v. Virginia Citizens Consumer Counsel, Inc. (1976), 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346, in which the Court invalidated a statute which prohibited pharmacists from advertising prices of prescriptions. In holding that the ban violated consumersþ First Amendment rights to receive information, the Court extended First Amendment protection "to the communication, to its source and to its recipients both." Virginia Bd. of Pharmacy, 425 U.S. at 756.

See also Red Lion Broadcasting Co. v. F.C.C. (1969), 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371, in which the Court required broadcasters to provide equal air time to competing political interests, holding that the "right of the viewers and listeners, not the right of broadcasters, . . . is paramount." Red Lion, 396 U.S. at 390.

Recognition of the recipient's rights is particularly compelling in Montana where there exists, in addition to the right to free speech found in the First Amendment to the United States Constitution and in Article II, Section 7 of the Montana Constitution, the "Right to Know" provision of Article II, Section 9 of the Montana Constitution.

The "Right to Know" provision grants the citizens of this state the right of access to all public documents and deliberations of public bodies. The contents of a communication which a trial participant might wish to make outside the courtroom or prior to trial, could be, under most circumstances, considered private communication rather than a governmental proceeding and thus not subject to the publicþs right to know. However, Article II, Section 9's guarantee of a right to know grants the public an interest in receiving information about the criminal process. Great Falls Tribune, 608 P.2d at 119; Smith, 654 P.2d at 986. This interest is broader than mere access to in-court proceedings or official court filings. Rather, the public has a right to receive information about the entire criminal law process. We hold that the right to know extends to receiving any information which pertains to the criminal law process, regardless of whether that information emanates directly from the courthouse or indirectly from those who are participating in the system as law enforcement officers, attorneys, parties or witnesses and who may wish to communicate with the public or the press about the process.

Our holding that the public and press have a right to know about the entire criminal law process is buttressed by the Ohio Supreme Court decision in State ex rel. National Broadcasting Company, Inc. v. Court of Common Pleas (Ohio 1990), 556 N.E.2d 1120. The Ohio Supreme Court held that a participant gag order, similar to the order at bar, violated the public's right of access to criminal proceedings under both the federal and state constitutions. In a previous case, the Ohio court had established that a newspaper had standing to challenge a trial court order prohibiting the public and reporters from pretrial hearings. The court in NBC, Inc. held that the same reasoning applied "with no less force to the criminal case as a whole," even though an order not directed at the media was a "lesser restriction" on access. NBC, Inc., 556 N.E.2d at 1124.

The Ohio Supreme Court relied on the United States Supreme Court decision in Press-Enterprise Co. v. Superior Court of California (1986), 478 U.S. 1, 106 S.Ct. 2735, 92 L.Ed.2d 1, which

held that the media had a First Amendment right of access to a transcript of a preliminary hearing, where the defendant could not show a "substantial probability" that his right to a fair trial would be prejudiced by releasing the information. Press-Enterprise, 478 U.S. at 14-15. The Court in Press-Enterprise based its holding on the federal constitutional right of access to proceedings which have "historically been open to the press and general public" and in which "public access plays a significant positive role in the functioning of the particular process in question." Press-Enterprise, 478 U.S. at 8. The Ohio Supreme Court, relying on Globe Newspaper Co. v. Superior Court (1982), 457 U.S. 596, 102 S.Ct. 2613, 73 L.Ed.2d 248, held that "[c]riminal trials have historically been open to the public, and public access has always been considered essential to the fair and orderly administration of our criminal justice system." NBC, Inc., 556 N.E.2d at 1124. The Ohio Supreme Court further recognized that the "open courts" provision of the Ohio Constitution also embraced a right of access. NBC, Inc., 556 N.E.2d at 1124. Because both federal and state constitutional principles recognized a right of access to criminal proceedings "as a whole," the court held that the participant gag order as challenged by the media was subject to scrutiny under the test established in Press-Enterprise for determining the constitutionality of restrictions on access to criminal trial proceedings. NBC, Inc., 556 N.E.2d at 1125.

We hold that participant gag orders, including the one at bar, do not constitute prior restraints on publication, and therefore are not subject to traditional prior restraint analysis. And, although  46-11-701, MCA, contains a standard for reviewing indirect restraints on the media, its provisions govern only access to official court proceedings and documents. Although participant gag orders are also an indirect restraint on the media, the restraint is not as intrusive as in the case of closure of proceedings which cuts off the media's access to official court proceedings. For this reason, a lesser level of scrutiny should be adopted to determine the constitutionality of a participant gag order. The level of scrutiny must protect both the defendant's right to a fair trial and the media's right to know under Article II, Section 9 of the Montana Constitution and the media's right to free speech under the First Amendment to the United States Constitution and Article II, Section 7 of the Montana Constitution.

Having recognized that Article II, Section 9 of the Montana Constitution guarantees the media a right to receive information about criminal proceedings, it is implicit that the media should not have information about the trial process restricted except to the extent that restrictions are required to protect the defendantþs right to an impartial jury under Article II, Section 24.

As indicated above, the "clear and present danger" standard employed by the prior restraint on publication doctrine is by definition and historical usage directed at the rights of the communicator rather than the recipient and thus does not adequately protect the media's right to receive information; that is, its right to "know" as opposed to its right to publish that which it already knows. Accordingly, we decline to employ the common law "clear and present danger" standard in evaluating a participant gag order challenged by the media. We likewise decline to employ the statutory "clear and present danger" standard used in 46-11-701(3), MCA, because we hold that the media has a lesser interest in communicating with trial participants than in accessing official court documents or court proceedings. By the same token, we find the "reasonableness" standard used by the Second Circuit in the Dow Jones decision too lenient a standard to adequately protect the right to know under Article II, Section 9.

As we recognized in Great Falls Tribune, the publicþs right to know under Article II, Section 9 must be balanced against the defendantþs right to an impartial jury under Article II, Section 24. In the context of a participant gag order, this balancing should be accomplished pursuant to a heightened scrutiny standard. Similar to the heightened scrutiny standard applied by courts for constitutional equal protection analysis, a heightened scrutiny standard applied to participant gag orders eliminates the stark choice between judging gag orders on either a reasonableness test or a "clear and present danger" test. The "clear and present danger test," in effect, treats first amendment rights as paramount; thus making it difficult to truly "balance" such rights against the right to a fair trial. As Justice White expressed in his concurring opinion in Nebraska Press Ass'n, "there is grave doubt" that a prior restraint on the press would ever be justified under the "clear and present danger" test. Nebraska Press Ass'n, 427 U.S. at 570-71 (White, J., concurring). A heightened scrutiny standard employs a middle-ground approach which accommodates the competing interests of free speech and fair trial rights.

Consistent with the Ohio Supreme Court's use of a heightened scrutiny test for the issuance of gag orders, we hold that where the rights of the accused to a fair trial are asserted, a gag order may issue only when the following conditions have been met: (1) the press and general public must be given an opportunity to be heard on the question before issuance of the order; (2) the court describes what reasonable alternatives have been considered and explains why those reasonable alternatives cannot adequately protect the defendant's fair trial rights; (3) the order is narrowly tailored to serve the interest of protecting the defendant's fair trial rights; and (4) the court has made specific findings that there is a substantial probability that the defendant's right to a fair trial will be prejudiced by publicity

that the gag order would otherwise prevent. This test grants more protection to the defendant than allowed under traditional prior restraint analysis and at the same time guarantees greater protection of the public's right to know under Article II, Section 9 of the Montana Constitution than offered by a reasonableness test. First, the participant speech in question must pose a substantial probability of harm to the trial process as compared with posing a clear and present danger to the trial process as is required to uphold a prior restraint or to close proceedings under 46-11-701, MCA. Secondly, unlike the reasonableness test, the heightened scrutiny test requires an order to be narrowly drawn. Broad sweeping gag orders which restrict "all counsel and Court personnel, all parties concerned with this litigation, whether plaintiffs or defendants, their relatives, close friends, and associates" from discussing the case "in any manner whatsoever" with the media will not pass muster. CBS, Inc., 522 F.2d at 236.

Employing a heightened scrutiny standard to participant gag orders challenged by the media protects the media's First Amendment rights as receivers of information and protects its "right to know" guaranteed under Article II, Section 9 of the Montana Constitution.

Summary

In summary, prior restraints on publication consist of court imposed restrictions (1) which are directed at the media, and (2) which intrude upon the media's editorial process by interfering with its right to publish material which it already possesses. Prior restraints are subject to the "clear and present danger" test established in New York Times.

Indirect restraints of the media include (without limitation):

(1) Restraints which are aimed at the media's ability to gather information or to access official proceedings but which do not intrude upon the media's prerogative to publish or edit information already in its possession. Examples include orders which prohibit the press from attending voir dire examinations or pretrial suppression hearings. Such restrictions are not "prior restraints" on publication but are, nonetheless, subject to the "clear and present danger" standard under Smith, 654 P.2d 982 and 46-11-701, MCA.

(2) Restraints which are not directed at the media but at the sources of information; for example, participant gag orders. Although such restrictions infringe upon the media's ability to access news and thus the public's right to know, they are not "prior restraints" upon the media's right to edit or publish that which it knows.

On a continuum, the participant gag order is not as intrusive as a "prior restraint" upon publication nor as intrusive as an order restricting news sources through closure of court proceedings or sealing of court documents, both of which trigger a "clear and

present danger" test. The participant gag order does, nonetheless, impinge upon the media's right to access news and thereby further the public's right to know. Such orders are, thus, subject to a heightened scrutiny analysis.

Conclusion

We HEREBY reverse the District Court's Restrictive Order and subsequent Memorandum and Order and remand for further proceedings consistent with this Opinion including application of the standard set forth in  46-11-701, MCA, to any decision to seal court documents and application of the heightened scrutiny standard to the issuance of any participant gag order. Without necessarily approving of the use of a Rule of Professional Conduct to regulate trial participant speech, we note for the District Court's consideration that Rule 3.6 of the Montana Rules of Professional Conduct no longer comports with the ABA Model Rule 3.6. The ABA Model Rule 3.6 was modified in 1994 in response to the United States Supreme Court's criticism of the Rule in Gentile v. State Bar of Nevada (1991), 501 U.S. 1030, 111 S.Ct. 2720, 115 L.Ed.2d 888. The Court found that in applying a Nevada Supreme Court rule nearly identical to ABA Model Rule 3.6, "[t]he lawyer has no principle for determining when his remarks pass from the safe harbor of the general to the forbidden sea of the elaborated." Gentile, 501 U.S. at 1048-49. The new version of the ABA Model Rule 3.6 clarified the list of presumptive statements that an attorney was allowed to make under the previous Rule and provided the attorney with a right of reply. Model Rules of Professional Conduct Rule 3.6(c) (1994). In the event the District Court issues a restrictive order upon remand, it should evaluate whether the unmodified Rule 3.6 of the Montana Rules of Professional Conduct is an appropriate model upon which to base a restrictive order in light of the ABA modification of the Rule.

/S/  W. WILLIAM LEAPHART

We concur:

/S/  J. A.  TURNAGE
/S/  TERRY N. TRIEWEILER
/S/  KARLA M. GRAY

Justice James C. Nelson dissents as follows:

I agree that the District Court's August 16, 1996 Restrictive Order should be reversed. I concur in our discussion and analysis as to the appropriateness of supervisory control and as to Issue 1. I respectfully dissent from our decision that the trial participant

or indirect gag order imposed by the court in this case is not a prior restraint on the media's right to gather news and to publish and, derivatively, on the public's right to know and receive information.  To the contrary, I conclude that such a gag order is a de facto prior restraint that presents the same evil of "censorship at the source" which we heretofore condemned in Great Falls Tribune v. District Court (1980), 186 Mont. 433, 438, 608 P.2d 116, 119, and that traditional prior restraint analysis is, therefore, required.

Before setting out the legal analysis of my disagreement with our decision on Issue 2, I will make one general observation. The trial participant gag order issued by the District Court in this case is, as far as I can tell, unprecedented in Montana.  If this case involved something akin to the trial of O.J. Simpson, Rodney King, Timothy McVeigh, Theodore Kaczynski or the Menendez brothers, I might understand (though not necessarily agree with) the trial court's concern that what is now commonly referred to as the "media circus" of cameras, equipment, satellite dishes, reporters and commentators, all in search of ratings and a story to sell, might prejudice the accused's right to a fair trial.  The fact is, however, O.J. Simpson, Kippy Joe Hill is not!

There is absolutely no evidence in the meager record of this case to date that would support a conclusion that Kippy Joe Hill's right to a fair trial was threatened either at the time the indirect gag orders were issued by the Justice and District Courts or that his rights are presently in jeopardy.  The charges against Mr. Hill are, in fact, no more "high profile" or of greater public interest than a multitude of other homicide cases that have been tried over the decades or that are presently pending in Montana's courts.  Quite to the contrary, there have been numerous homicide cases in Montana that have garnered infinitely more interest and ink than this case. See, for example, Duncan McKenzie, "The Mountain Men," Larry Moore, Ronald Smith, Becky Richards, Dewey Coleman, Bernard Fitzpatrick, Gene Austad, the Kills on Top brothers, Terry Langford, Brett Byers, James Egelhoff, Fred Van Dyken, Douglas Turner, William Gollehon--the list could go on and on.  Yet, each of those cases was prosecuted and defended without resort to the sort of preemptive strike against freedom of speech, freedom of the press and the public's right to know and to receive information that the trial participant gag order imposed in this case clearly presents.  Indeed, at oral argument, Mr. Hill's defense counsel readily conceded that there was nothing unique about this homicide case.

Now, unfortunately, there is.  For the first time we approve the use of trial participant gag orders by courts in criminal proceedings.  While, I am not usually impressed by "slippery slope" arguments, I do have that concern here.  Gag orders are simply too easy to impose.  The one issued here by the Justice Court was

imposed ex parte; the second one was imposed by the District Court and affected probably more than twenty people, including lawyers, witnesses, law enforcement and clerks, without so much as an evidentiary hearing or any input from the media, apparently simply because the defense counsel and the prosecutor agreed that these trial participants should be gagged.

Like the majority, I am not necessarily critical of the District Judge's handling of this matter in view of counsels' agreement and our lack of precedent, but the fact remains, this case ably demonstrates how it is all too easy to violate fundamental rights of free speech, free press and the public's right to know and to receive information with a well-meaning stroke of a pen.

Furthermore, even under the four-part approach which we have adopted, a court anxious to maintain the appearance of tight control over the case and counsel, fearful that its rulings may be publicly criticized, concerned over the threat of adverse pretrial publicity, determined to preemptively head off change of venue problems and the possibility of having to sequester the jury with the attendant impact on the local treasury, and set on making sure that the case is tried locally, will find little difficulty in gagging at least some of the trial participants. I greatly fear that although we have not allowed the "primrose path that leads to destruction of those societal values that open, public trials promote" to advance into the courtroom, Great Falls Tribune, 608 P.2d at 121, we have now effectively paved precisely such a route from the courthouse door to the reporter's desk.

Having made that general observation, I must next admit to being mystified with our reasoning and discussion of Issue 2 and with our holding that trial participant gag orders, including the one at bar, do not constitute prior restraints on publication, and, therefore, are not subject to traditional prior restraint analysis.

We first acknowledge the vaunted position of the public's and media's right to receive information about the entire criminal law process under Montana's Constitution--rights which are even more extensive and jealously guarded than such rights under the federal constitution.  With that, I heartily agree.  We then, however, conclude that trial participant gag orders are not prior restraints because they do not infringe upon the media's "right to edit or publish that which it knows."  How this latter conclusion follows from the first is not clear.  In fact, in my view, it does not track at all.

Admittedly, I have no background whatsoever in journalism. Notwithstanding, I have always understood that "news" is "gathered."  That is, the information which the media reports concerning a person or event must be first obtained by the reporter from someone, from some document or thing, or from some personal observation.  News information that appears in the print and

broadcast media does not, in "Big Bang" fashion, spring spontaneously into existence from the void, bringing with its creation the time, places, people and events reported. There must be a source; and the quantity and quality of the news (ineffective or biased reporting aside) is completely dependent upon the quantity and quality of the sources of information available.  No source; no news.

Again, without trying to be overly simplistic, it seems to me that if we tell the press "you can edit and publish what you know" and then, in the next breath, allow those sources of information from which the media traditionally gathers its information to be silenced on any but the most serious and compelling grounds which clearly prejudice the defendant's fair trial right, we have effectively precluded the press from "knowing," and, therefore, being able to "edit" or "publish" much of anything.  We have handed a thirsty man an empty cup with the admonition "drink all you want; but the well is off limits."  In short, as we have discussed the terms at issue here, the distinction between a direct prior restraint (where the media is gagged) and an indirect prior restraint (where the media's sources are gagged) is one without a substantive difference.  An indirect prior restraint is, de facto, a prior restraint, nonetheless.

Furthermore, making prior restraint analysis dependent upon the status of the party bringing the challenge is simply smoke and mirrors. It is purely a legal fiction with no foothold in reality. If the court imposes a gag order on trial participants--no matter what the level of scrutiny or what sort of test it uses--the end result is precisely the same and is equally intrusive and offensive: the media is prohibited from gathering and publishing the news and the public is prohibited from receiving it. The fundamental rights of both are denied.  It is for precisely this reason that I would require the highest level of scrutiny and the imposition of the clear and present danger standard--traditional prior restraint analysis--before I would allow a trial participant gag order to be imposed.

As the majority intimates, it appears clear, from a historical perspective, that the rise of the use of gag orders on trial participants followed in response to the U.S. Supreme Court's decision in Nebraska Press Ass'n v. Stuart (1976), 427 U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d 683. That case held that a gag order imposed on the media directly and which prohibited publication--in that case of the defendant's confession--constituted an unconstitutional prior restraint on free speech.  It was in that case that the three-part test was articulated that eventually became the basis for the procedure set out in our opinion in State ex rel. Smith v. District Court (1982), 201 Mont. 376, 654 P.2d 982, and in  46-11-701, MCA.  Unfortunately, relying on dictum in Nebraska Press Ass'n that in some circumstances limits may be imposed on what the

contending lawyers, police and witnesses may say to anyone, courts seeking to quash perceived prejudicial pretrial publicity have sought to do indirectly what they were prohibited from doing directly.

That dictum found its genesis in a pre-Nebraska Press Ass'n case, Sheppard v. Maxwell (1966), 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600. Like the "media circus" cases referred to earlier (and unlike the instant case), the homicide trial in Sheppard was characterized as having taken place in the "atmosphere of a 'Roman holiday' for the news media . . .." Sheppard, 384 U.S. at 356. The U.S. Supreme Court, critical of the state trial judge's handling of the publicity, again in dictum, suggested that the judge "might well have proscribed extrajudicial statements by any lawyer, party, witness, or court official which divulged prejudicial matters. . .." Sheppard, 384 U.S. at 361.

Importantly, the suggestion in Sheppard and in Nebraska Press Ass'n that indirect gag orders might in some cases be permissible was never anything more than dicta and in each case was simply thrown into the discussion of preferred less restrictive alternatives that might have been available to the trial court under the specific facts of the cases at issue. This is evident from the Supreme Court's comment in Nebraska Press Ass'n which cited to Sheppard:

At oral argument petitioners' counsel asserted that judicially imposed restraints on lawyers and others would be subject to challenge as interfering with press rights to news sources. [Citations omitted.] We are not now confronted with such issues. [Emphasis added.]

Nebraska Press Ass'n, 427 U.S. at 564 n.8. Neither case is proper authority for indirect gag orders, and I strongly disagree with our citation to Nebraska Pres Ass'n for that proposition.

Unfortunately, this dicta has taken on a life of its own and has been interpreted as being directive by those courts seeking an easy way to avoid the rule against direct gag orders. The result has been that in the decades since there has been a proliferation of orders restraining trial participants as a means of indirectly restraining the press, notwithstanding the availability of other options suggested by both Sheppard and Nebraska Press Ass'n. See Sheryl A. Bjork, Indirect Gag Orders and the Doctrine of Prior Restraint, 44 U. Miami L. Rev. 165, 176 (1989). Indeed, this trend has accelerated because of highly publicized cases. In response to the "media circus" cases mentioned earlier, at least one commentator has gone so far as to recommend the very sort of preemptive strike approach that the Justice and District Courts utilized in the instant case--i.e. the trial court should impose a gag order on trial participants immediately after the commencement of proceedings and then rely on voir dire to insure that jurors can

render an impartial verdict despite outside influences. This commentator maintains that traditional protections such as juror sequestration and change of venue are either violative of jurors' rights or just plain worthless given the immediate, wide-spread coverage of news events. See Charles H. Whitebread & Darrell W. Contreras, Free Press v. Fair Trial: Protecting the Criminal Defendant's Rights in a Highly Publicized Trial by Applying the Sheppard-Mu'Min Remedy, 69 S. Cal. L. Rev. 1587, 1620 (1996).

Again, it deserves repeating that the instant case never was and is not now the sort of "high profile," "media circus" case that has typified the use of and has fueled the continuing debate over the imposition of trial participant gag orders. That fact makes it even more unfortunate that we have chosen the instant low-profile case as the vehicle for approving a practice that is fundamentally based upon highly questionable legal authority.

Moreover, as the majority acknowledges, there is a conflict in the courts and in the circuits as to the appropriate standard under which indirect gag orders are issued. The courts which have upheld the issuance of gag orders on trial participants basically have employed a "reasonable likelihood" standard of review which only requires that the court evaluate whether it is reasonably likely that the pretrial publicity will jeopardize the accusedþs right to a fair trial. On the other hand, the courts which have struck down trial-participant gag orders have done so on the basis of the "clear and present danger" or "serious and imminent threat" test, which requires that the court reach an inescapable conclusion that speech will be prejudicial and that the threat of prejudice must be "present or imminent." This has also been characterized as the "high threshold test." See 69 S. Cal. L. Rev. at 1609 n.141.

Dissatisfied with either approach, we have now adopted from National Broadcasting Company, Inc. v. Court of Common Pleas (Ohio 1990), 556 N.E.2d 1120, what in theory, at least, is supposed to be a middle tier test with a level of scrutiny--"substantial probability"--that is higher than "reasonable likelihood" but lower than "clear and present danger."

At the outset, I note that the Ohio Supreme Court's decision was based primarily upon the U.S. Supreme Court's decisions in Richmond Newspapers, Inc. v. Virginia (1980), 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973; Globe Newspaper Co. v. Superior Court of California (1982), 457 U.S. 596, 102 S.Ct. 2613, 73 L.Ed.2d 248; Press-Enterprise Co. v. Superior Court (1984), 464 U.S. 501, 104 S.Ct. 819, 78 L.Ed.2d 629; and Press-Enterprise Co. v. Superior Court (1986), 478 U.S. 1, 106 S.Ct. 2735, 92 L.Ed.2d 1. Those cases did not involve trial participant gag orders, but, rather, dealt with media access to court proceedings or records of one sort or another--matters, which I presume from our analysis under Issue 1, would, in Montana, be covered by the "clear and present danger" test. Accordingly, for whatever reason the Ohio Court adopted the

substantial probability test to resolve the indirect gag order question at issue there (and its rationale is more conclusory than explanatory), I fail to see how the authority underpinning the Ohio Court's decision would, likewise, support our adoption of this approach in Montana. If we relied on the same authority as did the Ohio Supreme Court, we would have to conclude that, in Montana, the higher "clear and present danger" test would govern since Montana protects the right of access to information by the public and the media even more jealously than does the federal government.

Moreover, having extensively discussed the evils of prior restraint and the importance of freedom of speech, freedom of the press and the public's right to know and to receive information which are specially protected under Montana's Constitution and our prior case law, and, having concluded that the "First Amendment protects not just speech itself but the entire process of communication, including the exchange of ideas and information between speaker and listener," I cannot understand how this new test--which makes it easier for a judge to gag the sources of information traditionally relied upon by the media--serves to protect, much less advance, any of those aforementioned fundamental constitutional rights or the communication process or the exchange of ideas to which we refer.

Finally, and most importantly, the guts of this new test requires a showing--presumably by the person seeking the gag order--that "there is a substantial probability that the defendant's right to a fair trial will be prejudiced by publicity that the gag order would otherwise prevent." How exactly the "substantial probability" standard which we embrace differs from the "reasonable likelihood" standard which we reject is not clear, although, in conclusory fashion, the Ohio case and the federal cases which use it assume that there is a difference. Arguendo, if there is a distinction, it is a fine one, indeed.

More to the point, I suggest that simply using this different terminology will not necessarily assist the trial court in making its highly subjective judgment nor will it guarantee the heightened scrutiny which the majority agrees should be brought to bear in the court's decision-making process. Under the best of circumstances, the court's assessment of the impact of pretrial publicity at the time when indirect gag orders will most likely issue--very early in the case--can amount to little more than a clairvoyant inquiry into how media coverage might adversely affect a defendant's right to a fair trial at a stage when it is impossible to actually know. The Court must make a conclusion that is "of necessity speculative, dealing . . . with factors unknown and unknowable." Nebraska Press Ass'n, 427 U.S. at 563. Whether the test is "substantial probability" or "reasonable likelihood" makes little practical difference given the paucity of information that will most likely be available at the early stage of the proceedings at which the

court will be required to make its decision.

Furthermore, given the fundamental importance of the free speech, free press and freedom of information rights that definitely will be lost by the imposition of an indirect gag order versus the speculative nature of the defendant's fair trial rights that might be lost if the order is not imposed, I would opt not to cloud what has been historically a bright-line two-tiered approach with an indistinct middle-tier analysis of questionable lineage and doubtful efficacy. In my view, we should adhere to the "clear and present danger" standard for the imposition of trial participant gag orders. I believe this to be the better approach for the following reasons.

First, as I have stated above, I conclude that indirect gag orders are de facto prior restraints and that traditional prior restraint analysis is, therefore, required. While it is argued that trial participant gag orders only vicariously affect the press, the whole reason why trial courts issue such orders is to prevent the public dissemination of information. Accordingly, the intended and the real casualties of an indirect gag order are the media's access to information and the public's right to receive it.

In this regard, the whole focus of trial participant gag order cases is placed improperly on who is restrained, rather than on what is restrained. An indirect gag order effectively restrains expression in general--precisely the evil that the seminal case on prior restraint, Near v. Minnesota ex rel. Olson (1931), 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357, and later Nebraska Press Ass'n, sought to prohibit. The result is the loss of public debate that New York Times Co. v. Sullivan (1964), 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686, indicated was the primary concern of the First Amendment. To say that the press is free to publish information "it knows" but that the judiciary can dry up the sources of that information sanctions not only a preemptive strike on First Amendment, Article II, Section 7 and Article II, Section 9 rights, but disingenuously exalts form over substance.

Second, as pointed out in our discussion of Issue 1, this Court and the Montana Legislature have already specifically adopted the "clear and present danger" test with regard to pretrial court proceedings and records. Smith, 654 P.2d at 987-88; 46-11-701(3)(a) and (6). While neither Smith nor the statute specifically deal with the issue of trial participant gag orders, based upon Article II, Section 9 of the Montana Constitution, this Court and the Legislature have already established that any restraint on the right of access of the public and press to pretrial criminal proceedings must be reviewed under this highest level of scrutiny.

As indirect gag orders are de facto prior restraints on the First Amendment and Article II, Section 9 rights of the press and public, it is wholly inconsistent with existing Montana case and

statutory law to adopt some sort of lesser standard of review with respect to the imposition of such orders simply because they impact what is said or disseminated outside the courtroom.

Moreover, the fact that Montana has already adopted this test in relation to closing pretrial proceedings and sealing court records and the fact that we have re-affirmed the use of this test in those circumstances (see our discussion under Issue 1) belies the majority's expression of concern that application of the clear and present danger standard to judge requests for indirect gag orders would treat First Amendment rights as paramount. If use of this test does not render the rights to free speech, press and to know and receive information paramount in the former setting, there is no rational basis for concluding that using it in the latter context will either. The rights of the press, public and the defendant can be "balanced," if that is required, in either event.

Third, there are deleterious effects and serious consequences attendant to silencing trial participants that strongly militate against the imposition of indirect gag orders in all but the most clear cut and threatening of circumstances. All citizens, including criminal defendants, have a fundamental constitutional right of free speech under the federal and Montana constitutions. That right is obviously abridged by an indirect gag order. A defendant or his attorney may wish to go to the media with a perceived misuse of the judicial process or abuse by the prosecution; defendants who are public officials may wish to exonerate or explain themselves to their constituents; the defendant may wish to try to salvage his reputation and rebut the charges at a time when public and media attention are most focused upon him--waiting to be acquitted may not serve that same purpose. Since either side may call any witness who has any knowledge of the case, a gag order involving witnesses may have the potential of stifling a wide range of people and commentary--again, likely 20 or more people, from private citizens to public officials, were gagged in the instant case. Witnesses and defendants hailed into court against their wills do not voluntarily waive their First Amendment rights; most never even have an opportunity to protest before the gag order is issued; many--as here--likely do not even know that they are gagged. And, certainly, who among these will invest the time, trouble and expense of going to court to challenge the gag order.

Moreover, simply because one becomes an attorney, he or she does not forfeit First Amendment rights. An attorney may wish to speak out on a case in order to demonstrate the need for legal reform illustrated by his clientþs circumstances or to address perceived injustices in the case. Prosecutors and law enforcement may wish to address the public so witnesses and others with knowledge of the crime or the defendant may come forward or to quell public concern. In civil litigation, attorneys may wish to

inform the public, for example, of dangerous or defective products or some particular abusive or wrongful practice by an industry or governmental agency.

There exist adequate and effective ways of disciplining attorneys who actually violate the cannons of ethics or rules of professional conduct, short of prior restraint.  If violations are subsequently punished, then the harm caused, if any, is actually known and the court does not have to rely on speculation as to what "might occur if . . .."

Furthermore, judges should not be allowed to easily issue indirect gag orders. Issuing such a gag order is easy to do and difficult to undo, as those gagged must appear before the same judge that issued the order to contest it.  Attorneys and parties may be reluctant to do that and thus potentially incur the wrath of the issuing judge.  Simply ignoring the order will likely bring a contempt citation--again, as in this case--and contesting such a citation is not effective because of the collateral bar rule.  All of this has the effect of chilling speech.

Indirect gag orders, because they can be so easily issued, are particularly subject to overuse and over inclusiveness--again, witness the present orders.  When judges become censors, there are few, if any, checks and balances (absent, possibly appellate review); the potential for arbitrariness is great; and there is little timely or effective way of combating such abuse.  Worse, as mentioned above, indirect gag orders are typically issued early in the case when there is insufficient information on which to actually gauge the impact of publicity or even the need for some sort of protective order.  Thus, to a great extent, the issuing judge is operating in a vacuum in imposing the order. While indirect gag orders may be issued out of the legitimate desire to insure the defendant receives a fair trial, they may also be issued out of a desire by the judge to avoid criticism of his or her style, case management or rulings.

A trial participant gag order will, in all probability, effectively delay public speech to a time when the public has lost interest in the subject.  Hence, the effectiveness of public comment and debate is lost. Absent public dissemination of information about a case, the public will have little ability to judge the effectiveness, efficiency and fairness of its various legal institutions, organizations and public officers--courts, public offices, law enforcement, even the bar itself--or the competence of public officials involved.  The public loses the very source of information it needs to observe and to check the functioning of its government, institutions and public officials.

Fourth, even without focusing on the mediaþs (or on the gagged participantsþ) rights and the abridgment of those rights by de facto prior restraint, the public has a concomitant First Amendment right (and a similar right under Article II, Sections 7 and 9 in

Montana) to receive information. It has long been a tenant of federal constitutional law that the constitution protects the individualþs right to receive information and ideas. Stanley v. Georgia (1969), 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542; Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc. (1976), 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346. Although the majority seems to acknowledge this legal principle, it begs the question of how the public is to exercise this constitutional right if the main purveyor of information and ideas--the media--is effectively prohibited from gathering news in order to disseminate it.

Fifth, while the public and press still have access to pretrial and trial proceedings themselves, few people have the time or inclination to actually attend such proceedings. Moreover, those proceedings, even when reported, are highly sanitized via the formalities of courtroom procedure, the rules of evidence and courtroom decorum. Indirect gag orders inhibit or prohibit the press from discovering information that may contradict the courtroom version or provide an independent view of the proceedings at issue as well as the persons and the institutions involved.

In conclusion, it is for all of the above-mentioned reasons that I would hold that trial participant or indirect gag orders are de facto prior restraints upon the mediaþs rights of free speech and press and upon the media's and the publicþs right to receive information and right to know. As a de facto prior restraint, I would require that the trial judge subject any request for an indirect gag order to the "clear and present danger" test--i.e. the court must be convinced that there is a clear and present danger that the defendantþs right to a fair trial will be prejudiced. And, because, an indirect gag order is a de facto prior restraint, the presumption should be against issuance.

Moreover, before an indirect gag order is issued, the court should be required to give public notice and to hold a hearing on an expedited basis which hearing would include, at a minimum, the defendant, the government and any media organizations that wish to intervene. The court should be required to consider the nature and extent of pretrial publicity; whether an indirect gag order would be effective; and whether other measures would likely mitigate the effects of trial participants not having unrestrained access to the media. Finally, if such an order is imposed, then it should be narrowly drawn as to whom and as to what speech is covered.

Except to the extent that we have adopted some of these procedural safeguards, I cannot agree that our new middle-tier approach and substantial probability standard for the issuance of trial participant gag orders serves to protect, much less advance, the important fundamental rights of freedom of the press, freedom of speech, and the media's and the public's right to know and receive information which are extensively protected by Montana's

Constitution and which this Court has, heretofore, jealously guarded. While it may be necessary in rare circumstances to balance the defendant's fundamental right to a fair trial against these other fundamental rights by the issuance of an indirect gag order, we have in my estimation, improperly adopted a standard which will tip the scale decidedly in the defendant's favor in routine cases such as the one at bar. In allowing trial participants to be gagged in the absence of evidence of a most clear, present and imminent threat to the defendant's fair trial rights, we have truly sanctioned "censorship at the source."

If the "[c]losure of judicial proceedings breeds suspicion and mistrust in the minds of the public and representatives of the media," Great Falls Tribune, 608 P.2d at 119, will ordering trial participants not to talk to the media produce any different result?

I think not.

I respectfully dissent from our decision on Issue 2.


/S/ JAMES C. NELSON



Justice William E. Hunt, Sr., and District Court Judge Thomas McKittrick, sitting for former Justice Charles E. Erdmann, concur in the foregoing special concurrence and dissent.


/S/ WILLIAM E. HUNT, SR.

/S/ THOMAS M. McKITTRICK